FILED: 3/14/2025 1:07 PM
Vermont Superior Court
Chittenden Unit
25-CV-01142

USDC - DVT
2:25-cv-385

STATE OF VERMONT

| SUPERIOR COURT | CIVIL DIVISION |
|---|---|
| CHITTENDEN UNIT | DOCKET NO. 25-CV- |

A.L., individually and on behalf of minor E.R.;
N.D., individually and on behalf of minor N.S.,

<em>Plaintiffs</em>,

    v.

SNAP, INC.; SNAP, LLC; and BRANDON
RHOADES,

<em>Defendants</em>.

## COMPLAINT

> *On Monday, November 2, 2020, at approximately [2:00 a.m.], a Vermont State Police Trooper observed two juvenile females, later identified as 12 year-old ER and 12 year-old NS, standing in a roadway in Williston, Vermont. One of the juveniles, ER, did not have any shoes one, and NS's pants were undone; neither was dressed appropriately for the 37-degree weather. It was later learned that ER and NS had been picked up a by male they believed was 17 years old, later identified as [24 year-old] Brandon Rhoades, who gave them alcohol. . . . N.S. stated that they had met on the app, snap chat . . . ER reported that she had been sexually assaulted by Rhoades and given what she believed to be a Plan B pill after the assault. NS advised that Rhoades kissed her. Rhoades then left ER and NS on the side of the road where they were located by VSP.*

INFORMATION AND AFFIDAVIT OF PROBABLE CAUSE, *State v. Brandon L. Rhoades*, 20-CR-02831, CHITTENDEN CRIMINAL DIVISION, 3, 6 (Nov. 10, 2020).

    Plaintiffs A.L., individually and on behalf of minor E.R., and N.D., individually and on behalf of minor N.S., bring this action against Snap, Inc., Snap, LLC ("Snap") (operating as "Snapchat") and Brandon Rhoades ("Rhoades" or "Individual Defendant") (all defendants referred to collectively as "Defendants") for personal injuries caused by said Defendants and assert as follows:

## I.    INTRODUCTION

1.    This lawsuit seeks to hold Snap and Defendant Brandon Rhoades liable for the physical and emotional harms from sexual exploitation and abuse they caused to E.R. and N.S. in November 2020, after Snap connected E.R. and N.S. to Rhoades—a sexual predator—via its user-recommendation product (often called an "algorithm" and more specifically known as "Quick Add") and because of Snap's own representations and contributions that intended to and facilitated, encouraged, and ensured the connection between Rhoades and the girls.

2.    This lawsuit further seeks to hold Snap and its Snapchat social media product responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Snap and, specifically, for the harms Snap caused to minors E.R. and N.S. beginning when they were only 10 years old.

3.    This suit should come as no surprise to Snap, a company that has chosen to exploit vulnerabilities in human psychology and prey, in particular, on its youngest and most-vulnerable users in order to increase its own engagement by any means necessary.

4.    Snap was created by three college fraternity brothers and began as a sexting tool. When it failed to generate adult users, Snap began targeting minors. Snap's transition from a sexting tool to a place for children was akin to creating a kids' section in a strip-club and then marketing it to kids and parents as a Chuck E. Cheese. There are kids' games inside, but Snap has worked hard to conceal the existence of the strip club from parents, claims that their premises is monitored and safe, then makes kids play games in the company of and with predators looking for sex with children.

5.    Snap has long known of the harms to young and adolescent users posed by sexual predators on its site. Snap has also long known of the addictive quality of its platform. Snap has knowingly concealed or misrepresented to users and their parents the risk of harm related to its platform.

6.      Snap designs, markets, and distributes its products in a manner intended to convince consumers that Snapchat is safe and kid-appropriate. Despite this, Snap's practice was to allow accounts to stay active with dozens of reports lodged again them, including reports related to grooming and sextortion, while at the same time, Snap complained internally that identifying and protecting minors from sexually explicit content and predators would overburden its moderators' and create disproportionate admin cost.

7.      Snap prioritized profits over foreseeable harms to human life, and the harms to E.R., N.S., and their families, could and would have been avoided but for Snap's deception and failures to warn or its continued distribution of defective and inherently dangerous products to these children.

8.      Snap embeds design features into its products that serve no functional purpose but seek to increase engagement by minor users. Snapchat accomplishes this through a series of features that seek to exploit minor user susceptibility to persuasive design and the unlimited accumulation of unpredictable and uncertain rewards. Snap's own internal documents identified the risks and the harms it was causing to minors.

9.      Peer-reviewed studies and medical science identify causal relationships between certain social media products, including Snapchat, and severe mental health harms, including teen suicide, suicide risk factors, depression, anxiety, and other serious harms— many of the harms suffered by E.R. and N.S.

10.      During childhood and adolescence, the brain is still maturing. Snap understands this and designs its products with the goal of exploiting young users' diminished decision-making capacity, impulse control, emotional maturity, and limited psychological resiliency caused by users' incomplete brain development. Snap knows or should know that due to an enhanced dopamine experience from using its platform, its young users are much more likely to become addicted to its product, exercise poor judgment in their social media activity, and act impulsively in response to negative social media encounters. Snap then

knowingly exposes young and adolescent user to sexual predators after first making them more vulnerable and susceptible to manipulation by these predators.

11.    Snap knew that it was harming many of its minor users as a matter of design and failed to make material available or change its products to prevent such harms—including the harms at issue in this complaint.

12.    Snap's design, programming, and operation of its social media products, its failures to warn, its marketing and distribution to E.R. and N.S., and E.R. and N.S.'s subsequent exposure to and use of Snapchat, directly and proximately caused the harms at issue in this Complaint, which include sexual exploitation and abuse, addiction (a/k/a problematic use), sleep deprivation, anxiety, depression, and other serious mental health harms E.R. and N.S. did not experience before their Snapchat use began.

## CAUSES OF ACTION

13.    Plaintiffs' claims arise from Snap's product features and design, not from third-party content. Snap could have satisfied its duties to plaintiffs without changes to content posted by third parties on its app and without conducting detailed investigations. Snap could have prevented harm to plaintiffs by warning them of the harmful effects of its design features and about known dangers from sexual predators on its app. Plaintiffs' claims also rely on Snap's own speech and conduct. Snap misled consumers about Snapchat's design and concealed its knowledge about Snapchat's harmful effects on young and adolescent users. Further, Snap developed or created its own content that materially contributed to the sexual assaults committed by Rhoades. Snap-created content, via its Bitmojis, concealed Rhoades's real appearance, identity, and age while at the same making him appear innocuous and fun to 12-year-old N.S. and E.R.

14.    Strict Product Liability – Failure to Warn.  Snap's products are unreasonably dangerous and defective because Snap failed to provide adequate warnings to minor users and their parents of the known dangers of its app. At all times material Snapchat knew that

it directed young and adolescent users to unknown adult users at alarming rates and that predatory adults used its social media platforms to target child users for sexploitation and assault. Snap also knew but failed to warn about the dangers of mental, physical, and emotional harms arising from the foreseeable use of Snapchat as designed, distributed, and operated by Snap.

15.    Negligence – Design Defect and Failure to Warn. Plaintiffs bring claims for common law negligence against Snap arising from its unreasonably dangerous social-media products and its failure to warn of foreseeable dangers. Snap knew that its social-media products were harmful to many of its minor users and failed to act reasonably to redesign its products to ameliorate these harms or warn minor users and their parents of foreseeable dangers arising out of the foreseeable use of its products.

16.    Strict Product Liability – Design Defect. Plaintiffs bring claims against Snap for strict liability based upon the defective design of its products that renders its products not reasonably safe for ordinary consumers or minor users.  It is technologically feasible to design Snapchat in a manner that would substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Snapchat—including sexual exploitation from predatory adults, addiction, and related mental health harms—with a negligible, if any, increase in production cost and without altering third-party content.

17.    Vermont Consumer Protection Act, 9 V.S.A. § 2451 et seq. Snap engaged in unfair and/or deceptive acts or practices by marketing and representing its products as being safe for minors when Snap knew its products exposed children to sexual predators, and encouraged contact between children and unknown adult users. Snap knew its products were harmful to a significant percentage of its minor users and that Snap was intentionally seeking to addict Snapchat users under 18 in ways Snap knew to be harmful to those users' physical and mental health.  The unfair and/or deceptive acts or practices of Snap were a proximate cause of the harms suffered by the minor plaintiffs, E.R., N.S., and their families.

18.  <u>Unjust Enrichment</u>. Snap received a direct benefit—advertising revenue—from problematic and harmful use of its products by E.R. and N.S., and from the illegal use of it by Rhoades, and from Snap's practice of misappropriating personal data from underage users either without consent or far exceeding any consent provided.  Under the circumstances, it would be unjust and inequitable for Snap to retain those ill-gotten benefits.

19.  <u>Negligent, Dangerous Design</u>. Snap designed features that misrepresented strangers as "friends" to minors while using cartoon avatars to make potential predators appear harmless, directly exposing users like E.R. and N.S. to sexual exploitation and psychological harm. Despite knowing these risks and having feasible safety alternatives, Snap prioritized user engagement and profits over child safety, leading to the plaintiffs' injuries through features that encouraged addiction, harmful social comparison, and dangerous interactions with unknown adults.

20.  <u>Aiding and Abetting</u>. Plaintiffs bring claims that Snap knowingly facilitated sexual exploitation of minors through its platform design. The "Quick Add" feature connected underage users with adult predators, while Bitmoji avatars allowed individuals like Rhoades to conceal their true age and appearance behind friendly cartoon characters. Rather than merely passing information between users, Snap actively referred adult strangers to minors it knew were underage, presenting them as trustworthy "friends." Despite awareness that these features enabled sexual harm, Snap continued these practices to maximize ad revenue and minimize administrative costs. Snap's governing officers acted with malice, prioritizing profit over child safety, thereby consciously supporting and aiding and abetting in Rhoades's sexual assault and battery of minors E.R. and N.S.

21.  <u>Assault and Battery and Child Sexual Abuse</u>. Plaintiffs also bring claims under 12 V.S.A. § 522 against Brandon Rhoades for his sexual exploitation, assault, and battery of the minor plaintiffs, who were introduced to this defendant exclusively through their use of Snapchat and as a matter of Snap's design and operation of its Snapchat products.

22.     <u>Punitive Damages</u>. Snap's actions herein were those of its founders Evan Spiegel, Reggie Brown, and Bobby Murphy, its governing officers or its agents lawfully exercising their authority or were ratified by its governing officers. Snap at all times acted with bad motive and malice and with the hope of increasing its user numbers and profit at the known, direct expense of the health, safety, and welfare of its child users.

## II.    PARTIES

23.     Plaintiff A.L. is E.R.'s parent and legal guardian, and resides in Chittenden County, Vermont.  A.L. has not entered into a User Agreement or other contractual relationship with Snap in connection with E.R.'s use of Snap's products and further disaffirms any such agreements that her child may have purported to have entered into with Snap.  E.R. likewise disaffirms such agreements, if any, and is still a minor.  For these reasons, these plaintiffs are not bound by any arbitration, forum selection, choice of law, or class-action waiver set forth in any such agreements.

24.     Plaintiff N.D. is N.S.'s parent and legal guardian, and resides in Chittenden County, Vermont. N.D. has not entered into a User Agreement or other contractual relationship with Snap herein in connection with N.S.'s use of Snap's products and further disaffirms any such agreements that her child may have purported to have entered into with Snap. N.S. likewise disaffirms such agreements, if any, and is still a minor.  For these reasons, these plaintiffs are not bound by any arbitration, forum selection, choice of law, or class-action waiver set forth in any such agreements.

25.     Defendant Snap, Inc. ("Snap") is a Delaware corporation with its principal place of business in Santa Monica, CA.  Defendant Snap owns and operates the Snapchat social media platform and all component parts, which Snap distributes and makes widely available to users in the State of Vermont. Snap was founded in 2011, by three Stanford college students, Evan Spiegel, Bobby Murphy, and Reggie Brown. Snap develops and maintains the wildly popular Snapchat, Spectacles, and Bitmoji technology products, among

others. At all times material Defendant Snap was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Snap.

26.    Defendant Snap, LLC is a Nevada limited-liability company with a principal office address of 63 Market Street, Venice, CA, 90291. On information and belief, Snap, LLC is an entity under which Snapchat does business in Vermont, operates the Snapchat social media platform and all component parts, and distributes and makes widely available the platform to users in the State of Vermont. Snap, LLC's registered agent in Vermont is Corporation Service Company, 100 North Main Street, Suite 2, Barre, VT 05641. Snap, LLC and Snap, Inc. are referred to collectively and interchangeably as "Snap" throughout this complaint.

27.    Defendant Brandon Rhoades is an individual who currently resides at the Northwest State Correctional Facility in St. Albans, Vermont.

### III.    JURISDICTION AND VENUE

28.    This Court has personal jurisdiction over Snap because it transacts business in Vermont with Vermont residents. Plaintiffs' claims arise out of and relate to Snap's activities in Vermont, and Snap has purposefully availed itself of the benefit of transacting business in Vermont with Vermont residents. For example, Snap advertises and encourages use of its social media products in Vermont; enters into thousands of contracts with Vermont residents and businesses, including contracts relating to use of and advertising on the same social media products at issue; provides access to significant percentages of Vermont's population to its social media products; generates and send emails and other communications to Vermont residents, including to E.R. and N.S.; designs and distributes push notifications, recommendations, and other communications to Vermont residents all aimed at encouraging addiction and use of Snap's social media products, as it did here; actively and extensively collecting personal and location information belonging to Vermont residents, including E.R.

and N.S.; and generating revenue from Vermont activities that dwarf what many Vermont-based businesses generate.

29.     Defendant Snap also will not stop doing business in Vermont or bar Vermont residents from use of its products. The revenue Snap generates because of Vermont users and because its business model relies on being able to distribute its products to and enter into product-related contracts and transactions with Vermont residents (including children) is too significant. Walling off distribution and sales to Vermont would have a devastating impact on Snap's entire business, irrespective of its total number of users and locations worldwide.

30.     Plaintiffs are residents of Vermont and Snap distributed, and E.R. and N.S. acquired and used, Snap's products in Vermont, and suffered injuries here as a result.

31.     Brandon Rhoades also is a resident of Vermont and was at all times relevant.

32.     Venue is proper in this County because plaintiffs reside here. 12 V.S.A. § 402(a).

## IV.    FACTUAL ALLEGATIONS

33.     By late October 2020, N.S. and E.R. had been using Snapchat for more than a year. They both began using Snap when they were 10, and self-identified as minors to Snap.[1]

34.     Snap directed N.S. to connect with Rhoades via its Quick Add feature.  On information and belief, Snap knew or should have known that N.S. was a minor and that Rhoades was an adult. On information and belief, N.S. and Rhoades shared no mutual contacts or "friends."  They were geographically close, so Snapchat connected them.

35.     N.S. accepted the Quick Add because that is what she did on Snapchat.  Snap said Rhoades was her "friend," and someone she should meet.  Snap made him appear harmless and fun.

---

[1] Plaintiffs E.R and N.S. are still minors and as such, all their claims and the derivative claims of A.L. and N.D. are subject to 12 V.S.A. § 551(a)'s tolling provisions.

9



36.    In addition, Snap's features further pushed 12-year-old N.S. to engage with 24-year-old Rhoades by promising to increase her Snap Score by connecting with a "friend" like him.

37.    Rhoades was not her "friend." He was a sexual predator.

38.    Snap's filters concealed Rhoades's real appearance from N.S. Not only that, Snap's filters made him appear young and harmless. Rhoades went by the username **hockeylax30** and nickname **Brandon**.

39.    Snap presented Rhoades to other users as a Bitmoji, a cartoonish avatar that served as a profile for his Snapchat account. User avatars do not realistically portray users' physical appearance. Rhoades's Bitmoji portrayed him as a young, wide-eyed, innocent, and friendly looking boy.

40.    Seeing an actual image of Rhoades when their connection first began would have alerted minors N.S., and later E.R., that Rhoades was an adult.

10



41.     Snapchat's platform and design gave Rhoades access to N.S., and altered his features in a way that allowed him to gain her trust. Rhoades then began grooming N.S. and eventually convinced her and E.R. to meet him in person. Rhoades told the girls that he was a minor, and they told him they were 12.

42.     On November 1, 2020, N.S. slept over at E.R.'s house. When E.R.'s mother fell asleep, the girls snuck out and met Rhoades at a nearby elementary school. It was dark, cold, and difficult for them to see, but N.S. felt like she knew Rhoades based on her experiences with him on and because of Snapchat.

43.     Rhoades arrived with alcohol, vape, and "Plan B" morning-after pills. He got the girls in his car and drove them several miles away. He gave them alcohol and a vape—both things they had not tried. He tried to kiss N.S, but she was intoxicated and left the vehicle to be sick. Rhoades then climbed in the back seat with E.R. and raped her. E.R. said "no." Rhoades ignored her. After the rape, Rhoades gave 12-year-old E.R. a "Plan B."

44.     When Rhoades was done, E.R. exited the vehicle to find her friend. Rhoades quickly drove away with N.S.'s and E.R.'s shoes and jackets in his car, abandoning them in the snow in the early hours of the morning, several miles from home.

45.     An off-duty police officer happened to drive by on his way home from work, noticed the two young girls without shoes and coats, in the snow, and stopped.

46.    Defendant Rhoades was arrested a few days later, and after four years, he was sentenced to ten years for what he did in November 2020.  Meanwhile, Snap and its leadership have continued to engage in the conduct at issue in this Complaint.

**A.    Snap Knew its Product Was Dangerous from the Start**

47.    Snapchat, originally called "Picaboo" or "Pictaboo," began as a simple smartphone-based product premised on disappearing messages, a feature that remains essential to its popularity.



48.    The Snapchat concept comes from a 2010 incident when Reggie Brown sent a photo that he wished he had not. He told Evan Spiegel and Bobby Murphy that he wished there was a way to send disappearing photos. The three friends started Snapchat.

49.    Spiegel recognized disappearing messages to be "a million-dollar idea." He went on to become one of the youngest billionaires in the world through Snapchat.

50.    The three fraternity brothers wanted to create a platform that could handle conversations and activities people wanted to disappear from the digital record. For them, this included activities like underage drinking and sexual activity. Spiegel explains, "The norm of the internet age is to create platforms in which everything is saved—everything is stored and documented digitally. Snapchat went the opposite direction."[2]

---

[2] Gary Vaynerchuk, *The Snap Generation: A Guide to Snapchat's History* (Jan. 28, 2016), https://www.garyvaynerchuk.com/the-snap-generation-a-guide-to-snapchats-history/.

51.    The origin of Snapchat illustrates how important the transmission of illicit and illegal activity was to the platform.  Snapchat's creators wanted the ability to delete evidence of illicit and illegal activities. As an officer of Kappa Sigma fraternity at Stanford in 2009 and 2010, using email and social media, Mr. Spiegel discussed "making 300 Jell-O shots to get sorority girls drunk, urinating on one conquest and shopping for cocaine and marijuana."[3]  In one email he tells members of his fraternity, "Hope at least six girl[s] sucked your dicks last night.  Cuz that didn't happen for me," and signs it, "Fuckbitchesgetleid."[4] Other emails ruminate on fraternity pledge parties fueled by illegal drugs and underage drinking and laud the resulting sexual conquests.[5]

52.    People told the founders Snapchat's concept seemed troubling. "Everyone said, 'That is a terrible idea,'. . . 'Not only is nobody going to use it, they said, but the only people who do, will use it for sexting.'"[6]

53.    Further, Snap's founders designed and chose to operate Snapchat to make things disappear on the front end *and* the back end, meaning that critical data is not preserved or rendered inaccessible by design—effectively obstructing investigations.

54.    After its launch in 2011, Snap first intended to target Snapchat to mature audiences for its most obvious purpose: as a sexting tool. A draft press release written by

---

[3] Andrea Chang, *Snapchat CEO Evan Spiegel 'mortified' by leaked frat emails*, LOS ANGELES TIMES (May 28, 2014), https://www.latimes.com/business/technology/la-fi-tn-snapchat-evan-spiegel-20140528-story.html.
[4] *"Fuck Bitches Get Leid" – The Sleazy Frat Emails of Snapchat's CEO*, https://www.chesterfieldcs.com/single-men-dating-dallas-texas-review-2/fuck-bitches-get-leid-the-sleazy-frat-e-mails-of/ (last visited February 14, 2025).
[5] *Id*.
[6] Jacob Goldberg, *How Evan Spiegel transformed a "terrible idea" into the Snapchat generation*, CEO MAGAZINE (June 10, 2020), https://www.theceomagazine.com/business/coverstory/snapchat-evan-spiegel/ ("We were working on this idea of ephemerality and the ability to communicate visually, and at the time, everyone told us it was ridiculous," Spiegel said. "People said it was for sexting or they said it was stupid."). According to Mr. Spiegel, the idea for Snapchat was met with questions. Specifically, "[m]any wondered why anyone would want to send a disappearing photo." J.J. Colao, *The Inside Story of Snapchat: The World's Hottest App Or A $3 Billion Disappearing Act?*, FORBES (Jan. 6, 2014), https://www.forbes.com/sites/jjcolao/2014/01/06/the-inside-story-of-snapchat-the-worlds-hottest-app-or-a-3-billion-disappearing-act/?sh=3c52f29467d2.

Snapchat founder Bobby Murphy in 2011 reads, "Picaboo lets you and your boyfriend send photos for peeks and not keeps!"[7]

55.    Snapchat became a widely marketed app designed to fulfill users' social media needs.

**B.    Snap Pivots to Targets Minor Users.**

56.    Months after its launch, Picaboo had amassed only 127 users.  So the trio "pivoted" with a name change to Snapchat and began targeting minors.   Within a year, and with its new target audience of children and teens, Snapchat grew to more than 100,000 users.

57.    Children and teens are now Snap's most valuable demographic. Snap is considered a leader even among its competitors when it comes to effectively marketing and appealing to minors.

58.    Snap has invested millions of dollars to design, develop, distribute, and market its products to engage and retain the youngest possible audience, including,

    a.  Targeting minors in the marketing of Snapchat and known distribution to children under 13 and to children under 18 without parental consent;

    b.  Marketing and making other public characterizations about Snapchat that are materially false or misleading. For example, Snap advertises features to portray Snapchat as fun and harmless while withholding from its advertising and other disclosures features likely to cause harm to children; Snap claims that Snapchat is not addictive when Snap has actual knowledge to the contrary; Snap also claims that Snapchat is designed differently from other

---

[7] Colao, *supra* note 6. *See also* Nick Bilton, *Disruptions: Indiscreet Photos, Glimpsed Then Gone*, THE NEW YORK TIMES (May 6, 2012), https://archive.nytimes.com/bits.blogs.nytimes.com/2012/05/06/disruptions-indiscreet-photos-glimpsed-then-gone/?_r=0 ("The app's description in the Apple App Store does not mention sexting. But the accompanying images are of scantily clad women, and Apple has designated the app as being for users 12 and older, warning of 'mild sexual content or nudity.' Mentions of the app on Twitter indicate that many young people use it for photo-based banter with friends, though there are references to its less innocent potential.").

social media products and utilizes all available technologies to ensure the safety of kids when it does not;

c.  Designing, implementing, and making available and/or utilizing products and processes that are defective and/or inherently dangerous in connection with minor users. For example, Snap uses back-end data deletion practices, direct messaging products, disappearing and inherently dangerous and/or misleading messaging products and options, and hidden data vaults;

d.  Designing, programming, and operating its user-recommendation products to identify, encourage, and affirmatively connect minor users with other users (often adults), which Snap knows to be problematic, inappropriate, harmful, and detrimental to the mental and physical health of its minor users; but also, Snap's decision to do so despite repeatedly (and falsely) telling its users that it does not make recommendations unless the users are likely to know each other in real life, and similar design, programming and operating choices;

e.  Designing, programming, and operating its products group and content-recommendation products to identify, encourage, and affirmatively connect minor users with subject matter (referred to as content when discussed on a piece-by-piece basis) in a manner that Snap knows or should know to be problematic, inappropriate, harmful, and highly detrimental to the mental and physical health of its minor users;

f.  Continued operation of proprietary algorithms without disclosure and despite knowledge that these products suffer an algorithmic bias and/or algorithmic discrimination defect, that is, where Snap's design, programming and/or operational decisions are affirmatively directing disproportionately higher amounts of violent, sexual, and other harmful and unwanted subject matters to vulnerable users and/or protected classes, including children, women, persons of color, and low socio-economic status ("low-SES");

15

g. Continued operation of the "Quick Add" and possibly other proprietary algorithm products without disclosure and despite the fact that Snap knew or should have known that these products suffer from a severe algorithmic discrimination defect—namely, that Snap's design, programming and/or operational decisions are resulting in Snap's provision of certain user recommendations and account viewing services to male users and adult female users that bear almost no resemblance to the same types of services Snap provides to young female users, resulting in Snap providing inherently dangerous and discriminatory services to young female users based on Snap's determinations and assumptions regarding their age and gender;

h. The design and sending of communications, such as push notifications and emails, to minor users in the user's state of residence, where Snap has designed and sends such notifications and direct communications in excess and at inherently harmful times of day to encourage and compel minor users to continue using Snapchat (even after the user had already chosen to not use Snapchat); and

i. Designing, distributing, programming, and operating Snapchat in a manner designed to create and encourage addiction in young users in other ways, some of which are known and set forth herein and others of which are unknown to anyone but Snap but will be revealed in discovery in this case.

59. Snap's marketing strategy focuses on juvenile cartoons. One marketing video, titled "Real Friends" reads: "we talked to thousands of people around the world about their Real friends." Snap then features users talking about their Snap-developed friendships, and follows this with avatars (cartoons) of their new Snap-friends:



60.     This ad promotes Snapchat use by children, and encourages child users to engage with and make new "Snap-friends" and creates a sense of safety for children and their parents.

61.     Another Snapchat commercial focuses on Snap's photo filters, which is one of Snap's most popular and appealing products when it comes to children and teens:



62.     A third Snapchat commercial opens with two toys (a ghost and a robot) entering a "Snaps" booth. It reads "Happy Snapping! Enjoy the new, faster Snapchat, rebuilt just for Android" then features various goofy photo booth pictures, also appealing to children and teens:



63.    The evolution of Snapchat as a sexting app targeted only to consenting adults to one Snap aimed at children also is reflected in its App Store marketing over the years. For example, this is how Snap marketed its products when first released in 2011,[8]



As compared to how Snapchat was marketing its products in App stores by 2021,

---

[8] *Snapchat's History: Evolution of Snapchat and Timeline (2024)* (Jan. 3, 2024), https://www.buycustomgeofilters.com/blog/snapchat-history-and-updated-timeline (last visited Mar. 14, 2025).



64.    Snap also frequently positions itself or is positioned in third-party app stores in a manner intended to perpetuate the deception of its safety. For example, on January 17, 2025, Snap was featured in the Apple App Store alongside a game. When certain iPhone users opened the app store application that day, this was the first thing they saw:



65.     By 2020, Snapchat was being used by an estimated 69% to 82% of all U.S. teens (aged 13 to 17)—though Snap estimates that number to be as high as 90%—and 36% of U.S. teens report that Snap is their favorite of all the social media apps.

66.     Snap estimates having between 92.8 and 96.6 million users in the U.S., at least 17 to 17.7 million of which are under the age of 18.

67.     By 2021, Snap employed 5,661 people and made 4.12 billion in revenue; by Q2 2022, Snapchat had 347 million daily active users worldwide and an average of over 5 billion Snaps are sent every day.

68.     Snap represents to child users and their parents that its products are safe and fun for children, but these representations are false.

**C.    Snap Conceals that Its Products Connect Children to Predators and are Dangerously Addictive and Chooses not to Warn Child Users and Parents**

69.     Snap designed and has progressively modified Snapchat to promote problematic and excessive use, particularly among children, teens, and young adults, which Snap knows to be indicative of addictive and self-destructive use. Snap designs its products to be addictive and Snap's products are harmful regardless of platform content.

70.     Snap programs its technologies to first determine individual user preferences so that it can then influence user behavior and choices once the user is hooked—which is particularly dangerous in the case of teens.

71.     Children like E.R. and N.S. are being harmed by Snap's products, marketing and misrepresentations, programming, and decisions to expose teens and children to harmful product features and to push them into harmful connections with strangers by design.

72.     E.R., N.S., and children like them become addicted to Snap, leading them to engage in addictive behaviors and to suffer foreseeable addiction-related harms.

73.     Snapchat encourages harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, self-harm, and suicidality.

74.    E.R. and N.S., did not know they would be targeted and exploited by predatory adult users.  They did not know that Snap's inherently dangerous design would, unreasonably expose them to danger by sharing their information, location, and/or vulnerabilities to adult users in Snap's attempts to generate profit. Snap could have designed reasonably safe social-media products and could have furnished adequate warnings of foreseeable dangers arising out of the use of its products to users and parents without altering, deleting, or modifying the content of a single third-party post or communication or removing a single Snapchat user from its platform. Snap chose not to.

**i. Sexual predators target children on snap**

75.    According to the Centers for Disease Control, 91 percent of sexual abuse is perpetrated by someone who the child either knows or trusts. One tool commonly used by predators to gain kids' trust is grooming.

76.    Sexual predators use social media to groom vulnerable kids.

77.    "Grooming" is a general term for the preparatory manipulation of children into sexual victimization; it describes a course of conduct engaged in for the purpose of encouraging or manipulating the child or young person to engage in sexual behavior.[9] Grooming is when a predator builds a relationship, trust, and emotional connection with a child or young person so they can manipulate, exploit and abuse them. Children and young people who are groomed can be sexually abused, exploited, or trafficked.

78.    UNICEF has identified online grooming as one of the key global threats that "expose[s] children to sexual abuse and exploitation."[10] Online grooming often involves adults creating fake social media profiles and posing as children or teens in order to befriend someone and gain their trust. This may be the first step towards sexual abuse or online stalking or harassment.  It is easy to pretend to be someone else on social media (online

---

[9] Samantha Craven, et al., *Current Responses to Sexual Grooming: Implications for Prevention*, 46 HOWARD J. CRIM. AND JUST. 60, 61 (2007)
[10] INTERNATIONAL CENTRE FOR MISSING & EXPLOITED CHILDREN, ONLINE GROOMING OF CHILDREN FOR SEXUAL PURPOSES:  MODEL LEGISLATION AND GLOBAL REVIEW 5 (2017)

impersonation). Children often have conversations on social media with people whose real identities the children may not know.

79.    A distinctive feature of online grooming is the manner in which interactions occur: the exploitation may consist of getting the young person to send sexually explicit photographs of themselves; to take part in sexual activities via a webcam or smartphone; to have sexual conversations online or by text; and/or to agree to meet with the offender so that contact abuse can take place.[11]  Pedophiles frequently present themselves online as younger and with similar interests and attitudes as their child victim. Less security conscious than older users when using social media, children and young people often quickly befriend strangers via interactions on social media.[12]

80.    Online groomers target children on sites and platforms popular with young people. Once they have the child's trust, the groomer often steers the online conversation towards their sexual experiences, even asking them to send sexual photographs or videos of themselves. Some may try to set up a meeting or even blackmail children by threatening to share the pictures or videos with the child's family and friends.

81.    Sextortion is a form of online sexual exploitation where children are threatened or blackmailed, most often with the possibility of sharing with the public nude or sexual images of the child by a person who demands additional sexual content, sexual activity, or money from the child. This crime may happen when a child has shared an image with someone that they thought they knew or trusted, but in many cases they are targeted by an individual they met online who obtained a sexual image from the child through deceit, coercion, or some other method. In many cases, the blackmailers may have stolen or taken images of another person and they are communicating through a fake account. The blackmailer may have sent images as well.

---

[11] Claire Lilley, *UK Policy Responses and Their International Relevance* in ONLINE RISK TO CHILDREN: IMPACT, PROTECTION AND PREVENTION, 189, 191 (JON BROWN, ED.) (JOHN WILEY & SONS 2017)
[12] Owen Gough, *Millennial Employees Sloppiest at Cyber Security, Study Finds*, SMALL BUSINESS (UK) (Oct. 18, 2017), https://smallbusiness.co.uk/millennial-employees-cyber-security-2541207/.

ii.    **Snapchat's Quick Add product connects underage users to predators**

82.    Snapchat's user recommendation product is known as Quick Add.  A Quick Add request is not generated by the recommended account, or in response to any user input, but rather is a communication generated by Snapchat itself in order to increase usage of its product.  A Quick Add request is not third-party content.  This technology affirmatively selects and sends recommendations to users regarding people and/or groups Snap wants them to "friend."

83.    These technologies and specific products function by taking user data obtained through Snap's data-collection practices and technologies to then identify and affirmatively direct users to one another via recommendations of Snap's sole choosing.

84.    These user-recommendation products are good for Snap's engagement because they help users connect with other users with whom they otherwise would not connect.

85.    At the same time, however, these user-recommendation products are dangerous because Snap at all times relevant opted both to use them in connection with minor accounts and to design, program, and operate them for engagement over safety. Snap's business decisions in this regard have aided, facilitated, and otherwise contributed to a significant amount of the adult-on-minor grooming and exploitation that has occurred on Snapchat, including the abuses of E.R. and N.S.

86.    On information and belief, Snap's technologies work (under the programming choices made at all times relevant to this complaint) by effectively rewarding predatory users for past success. That is, the more success a user has exploiting and abusing minors, the more Snapchat rewards them by connecting them with additional young and vulnerable female users. Snap's technologies recognize and are programmed to find that adult user more young and vulnerable female users—irrespective of the harms to those minor users.

87.     These types of programming and product features allow strangers to identify and contact underage users not already on their "friend" list or known to them—that is, children who these strangers do not know in real life or even virtually. While Snap determined that such access to minor users (all users, really) is good for its engagement, it also knew that it was exposing children to strangers in an impossible-for-parents-to-protect-against way. Snap could have turned Quick Add off by default for minor accounts and could have provided other default safety options and restricted data-collection options for minor users.

88.     While Snap has denied in other litigation that its Quick Add feature at any point considered factors such as location when Snap made recommendations, plaintiffs dispute that this is accurate.  Numerous users and commentators note that Snap's Quick Add feature takes location into account when matchmaking, including because the Quick Add feature frequently recommends strangers who appear to have nothing more in common with users than living nearby.

89.     As early as 2019, Snap's own research and testing confirmed that Snap was recommending strangers via its Quick Add feature more than half the time. Snap's own employees did not understand how Quick Add suggestions were being made and wondered whether location was used based on their personal experiences with the app.

90.     On information and belief, Snap has used both country and region as part of its Quick Add feature, exponentially increasing the risk of harm to minor users by making them more accessible to nearby predators as a matter of design.

91.     These programming and product features are unnecessary to any communication aspects of Snap's platform and serve no critical purpose as to product functionality or a user's ability to access content posted by other users.  They do, however, encourage and provide adult users the ability to identify and access close-in-location minors for the purpose of sexual abuse and exploitation—a dangerous defect known to Snap.

24

92.     Snap knew about these products and their programming of these products, while the U.S. Government and consumers did not. Snap knew that its design, distribution, and programming decisions were causing and/or contributing to the abuse and exploitation of millions of children.

93.     The effectiveness of Quick Add is due to Snap's own representations and design choices.  Snap does not simply provide minor users with a list of nearby and/or otherwise "connected" Snapchat users but instead tells them multiple times and in multiple ways that these strangers are their "friends"; that "you may know" them; that "interacting with friends is what Snapchat's all about!" and similar statements designed to—and that do—convince young and vulnerable users to connect with predatory strangers.

94.     Snapchat further surrounds these statements with cartoon animals and balloons, making the process appear safe and fun; sometimes, when a minor user declines, Snap simply pushes them back into the request until they concede.

95.     Snap also then promises rewards (and does reward) young users who accept Snap's prompts and do as Snap tells these young users—by connecting directly with strangers—through various gamification products like Scores, Streaks, Charms, Trophies, and the appearance of "friends" on one's Snap Map.  These features are based on social validation and hidden-reward mechanisms, which push users—particularly young users— into accepting Snap's recommendations, and viewing those as fun and exciting, rather than dangerous.

96.     This is what happened with E.R. and N.S.

97.     Indeed, many young users of Snapchat—including E.R. and N.S.—have reported that they believed Snap's representations.  For example, they believed that these strangers were people they knew in real life; they believed that these strangers were their friends; they understood that Snapchat had determined these strangers had a lot in common with them. Snap promised to remove people who violated rules, and users relied on those promises and believed that Snap would not be recommending these "friends" if they were

dangerous. Many children trust Snap, as Snap intends, and connect with Snap-recommended predators as a result.

### iii.    Snap-created product features manipulate kids to connect with adult predators

98.    At times relevant, Snapchat had an "Add All" button tied to Quick Add, such that a new user had the option to add 200 Snapchat users at one time. Many minors used this feature, trusting Snap's representations that they knew these strangers and that connecting with them would make their Snapchat experience more fun.

99.    Snapchat also had an "Add 5" button, urging users on an ongoing basis to simply push the "Add 5" button to accept five of Snapchat's Quick Add recommendations at one time. Many minors also used this feature, trusting Snap's representations that minors knew these strangers and that connecting with the strangers would make the minors' Snapchat experience more fun.

100.    The "Add 5" button manipulates minors' desire for social expansion and exposes kids to predators. Minor users are particularly susceptible to this form of manipulation, as Snap knows.

101.    E.R. and N.S. were susceptible to this manipulation and allowed access to their contacts. This access is simply another way that Snap represents to users that when it then makes Quick Add recommendations, those recommendations are people the user knows or may want to know in real life—which is not always the case and was not the case for E.R. and N.S.

102.    At all times relevant, Snap, at sign-up or shortly thereafter, directed users to its Quick Add product.

103.    Snap made statements and used messaging designed to push minor users— like and including E.R. and N.S.—to engage with strangers for its own benefit. Snap told and convinced E.R. and N.S. that these were "Friends" and "people you may know."



104.    Children like and including E.R. and N.S. believe Snap's representations and rely on them, accepting Snap's recommended connections under the misguided belief that these are people the children know—not predators who pose a serious danger to minors' safety.

105.    Moreover, on information and belief, Snap's messaging has changed over time, including its efforts to make its product appear safer since the filing of the first social-media complaints in January 2022.  In other words, there is a good chance that Snap's statements at the time E.R. and N.S. opened their Snapchat accounts were even more manipulative and deceptive.  There is no way to know for certain, however, absent discovery.

106.    On information and belief, when E.R. and N.S. began using Snapchat, Snap's design recommended minor users (even where they self-identified as minors) to adult users and complete strangers, including the Individual Defendant.  But again, Snap did not warn E.R. or N.S. that it was doing so, and E.R. and N.S. reasonably relied on Snap's many representations and statements that the persons Snapchat was connecting or recommending

to E.R. and N.S. were people E.R. and N.S. knew in real life or people E.R. and N.S. would want to know.

107.    Snap's design and programming decisions, as described above, were designed to control and manipulate users and, in particular, minor users.  Snap was aware at all times relevant that minor users were both vulnerable and profitable, and so Snap designed its products and communications around exploiting those vulnerabilities.

**D.    Snap's Design Features Were Alarmingly Addictive and Inherently Dangerous Regardless of Third-Party Content**

108.    Snapchat is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Examples of this in the Snapchat product include but are not limited to features like Snap's series of rewards, including trophies, streaks, and other signals of social recognition, recommendation technologies, and unlimited-scrolling features.

109.    Snap has actual knowledge that its products are harming minors but fails to warn minor users or its parents about the dangers of its products or how they can mitigate the foreseeable dangers and harms posed by its products, Instead, Snap opts to design and distribute for engagement above all else.

**i. Streak features**

110.    Snap Streaks gamify daily interactions by tracking consecutive days users exchange Snaps, creating a dangerously addictive cycle that compels users, especially minors, to maintain constant engagement for fear of losing their streak status.

111.    The Snap Streak feature is unique to Defendant Snap's product and is one of the most—if not the most—addictive products available, especially to teenagers. Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that product to teens and children.

112.    For example, in March 2019, BBC reported that British Members of Parliament (MPs) were concerned about the potentially addictive nature of Snap Streaks and had met with Snap executives. Snap reportedly told British MPs that it would "revisit" its Streaks feature; however, on information and belief, Snap opted to maintain this particularly addictive feature irrespective of such warnings and knowledge.

113.    More recently, on February 17, 2024, CNY Central reported on how Snap's Streak *is meant to addict teens by design*:

> And that is exactly what's happening according to Dr. Christopher Lucas, the vice chair of psychiatry at Upstate University Hospital, "I think what's different about the streak is that your performance is on display to others so there can be a real pressure to compete with others."
>
> Dr. Lucas says tech companies deliberately try to engage kids on the platforms. Some promise rewards, but Dr. Lucas said they can cause distress among some children if they don't complete a task.
>
> "Every time those things happen, you get a buzz of dopamine in your brain which is the reward chemical and that can be the same as eating a cookie or smoking a cigarette. It's the same mechanism. And after a while, your brain attenuates to that so that you need more and more in order to get the same positive effect."[13]

### ii.    Direct messaging, disappearing messaging, algorithmic discrimination, and other dangerous products and programming decisions

114.    Snap's direct-messaging products trigger this system of rewards and are inherently dangerous and defective for minor users.

115.    Snap's direct- and disappearing-messaging products (disappearing on the back end specifically as compared to the front end) are unnecessary and serve no critical purpose to product functionality.

116.    They are, however, incredibly profitable in terms of engagement and retention of teen users, as well as engagement and retention of adult users who want access

---

[13] Megan Coleman, *How 'streaks' spur young people's growing addiction to social media*, CNY CENTRAL (Feb. 28, 2024), https://cnycentral.com/news/local/how-streaks-spur-young-peoples-growing-addiction-to-social-media.

to vulnerable children and teens outside the purview of the children's parents and law enforcement.

117.    Snap's direct-messaging products provide other users—including anonymous and semi-anonymous adult users, bullies under the age of eighteen, and any other stranger for whom a parent would not allow access—with unrestricted and unsupervised access to minor users. Minor users lack the cognitive ability and life experience to identify online-grooming behavior by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material and mass-messaging capabilities. These products further allow direct messaging with and by minors without parental notification.

118.    Snap could have restricted such products so that minor users could not use them or could only receive such messages from persons approved by the minor's parent or guardian or could even program its products in a manner that—like many of its competitors and companies in other industries—preserves material evidence and/or data relating to minor users on the back end.

119.    Under its current design and operating protocols, however, Snap does not reasonably preserve material evidence even after receipt of notice of civil and/or criminal investigation.  For example, on information and belief, even after law enforcement would have subpoenaed and issued preservation requests to Snap for records relating to Defendant Brandon Rhoades, Snap would have allowed him to use its application without conducting the necessary programming and/or product changes to ensure preservation of his ongoing communications with plaintiffs and/or other minor users.

120.    On information and belief, Snap could accomplish such preservation in the event of law enforcement and/or civil preservation notices in a reasonable and timely manner, but has chosen to not assess and/or undertake such efforts, at least in part, because it does not want to engage in any action that would effectively negate what it knows to be its primary selling point for millions of its users—the ability to send Snaps and otherwise engage in a manner that ensures no record of what transpires.

121.    Plaintiffs are not suggesting companies could never design, manufacture, and distribute products that make data disappear.  After all, that is what a paper shredder does.

122.    Plaintiffs contend that Snap cannot market its products as fun and safe for children, when they are designed to prevent parents from knowing about or being able to monitor or prevent unsafe use. Snap cannot further incentivize and encourage kids to enter private rooms with strangers, then promise bad actors that it will cover their tracks regarding what is done in those rooms.

123.    Yet that is exactly what Snap has done as a matter of design, and it has made billions in revenue—from companies paying to have those rooms wallpapered with their advertisements—as a result, and at the expense of millions of American children.

124.    In addition to connecting predators with kids, Snap has implemented further product designs that actively assist predators in finding children in real life.

125.    For example, Snapchat allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map.

126.    At all times relevant, Snap made this feature available to all users, including minors. This product feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these harms are known to Snap.

127.    Further, Snap's design, programming, and distribution of these products—as described above—discriminate against minors based on age, gender, and other protected characteristics. For example, an account opened by a self-identified adult female and not running any searches might receive the following from Snap via the



31

Discover/Stories feature (a feature Snap claims to curate and from which, on information and belief, it receives significant marketing fees in exchange for such curation).

128.    While an account opened by a self-identified minor male and not running any searches might receive the following from Snap via the Discover/Stories feature.



129.    These are choices made by Snap without any user input or request. Moreover, such differences in output—which are a matter of design—further prevent many parents from discovering defects and/or inherent dangers.  Many parents open a Snapchat account to understand what their child is using or has asked to use. But the way Snap represents its products to those adult users gives the false appearance that they are safe.

130.    Snap operates its products with a dangerous degree of algorithmic discrimination, which is a matter of design and could be programmed out of Snap's products. Snap knows or should know of this defect but has failed to make changes and millions of young people, including E.R. and N.S., have been harmed as direct and proximate result.

131.    Snap also has designed its products around sunk-cost and network-effect principles and continues to implement and program and/or operate numerous product features in ways it knows to be dangerous to young users. These designs and decisions are hidden from ordinary and reasonable consumers.

### iii.    Push notifications and emails

132.    Snap's push notifications and emails encourage addictive behavior and are designed specifically to increase use of Snapchat.

133.    Push notifications are clickable, pop-up notifications that Snap "pushes" to users after they have logged off Snapchat, specifically to pull them back in and persuade them to continue using.  On information and belief, Snap has put significant time and thought into the wording of those notifications, designing and re-designing them over time and to

make them more effective. On information and belief Snap also targets young users with email and other forms of communication, where it has access to such information.

134.    Snap's notifications to individual users are specifically designed to, and do, prompt them to open Snap's social-media products and view the content Snap selects, thereby increasing sessions and profits to Snap. Snap drafts and decides the language of these notifications. Snap's notifications have been designed with the purpose of pulling users back onto its social media platform—irrespective of a user's health or wellbeing.

135.    For example, instead of telling a user what someone on their "friends" list said, Snap will create and push a vague and enticing message to the user to maximize the likelihood that the user will log back onto its product.

136.    These prompts are effective, as Snap knows, and accomplished its purpose of pushing E.R. and N.S. back onto the Snapchat application during times and in ways that were harmful to their mental health: for example, late at night, during school hours, when they were trying to focus on homework, and at other times when E.R. and N.S. had made the choice to stop using Snapchat. But Snap would override that decision and target E.R. and N.S. with notifications and statements that pulled E.R. and N.S. back onto its platform.

137.    Snap targets young users with these notifications and sends them to young users in the state of Vermont at all hours of the day and night—including during school and sleeping hours. On information and belief, Snap sends more of these notifications to minor users than they do to the average American adult consumer.

### iv.    Social comparison and other addictive product features

138.    Snap incorporates several unique product features that serve no functional purpose, but that do make its products more appealing to children and teens (*i.e.*, filters, avatars, emojis, and games) while simultaneously increasing social-comparison pressure and resulting harm.

139.    Each of the above product-design, distribution, and programming decisions are dangerous alone, but they are substantially more dangerous when combined. For

example, Snap's disappearing- and direct-messaging products are more dangerous when coupled with minor accounts of which parents have no knowledge (or means to monitor) and do not consent; and even more dangerous when combined with Snap's recommendation features.

140.    Snap thus intentionally designed Snapchat to maximize user engagement through features like disappearing messages, Snap Map, and Quick Add. Snap employed invasive technologies such as algorithmic recommendations and search functionality that connected predators with minors. Snap chose not to warn users or parents about these dangers, including its inadequate age verification and the potential for exploitation. Despite knowledge of harm to young users, evidenced by the discovery of over 10,000 Snapchat-related child sexual abuse records on the dark web,[14] Snap refused to implement effective restrictions for minors or enhance safety measures. This approach prioritized engagement over user protection, particularly endangering vulnerable young users like the minor plaintiffs.

141.    The cost of designing safer products and fixing known defects is negligible. In fact, each of the above examples could be addressed in a matter of hours, not weeks. These products serve no purpose for consumers, and the benefit of making the necessary changes would be high in terms of reducing the quantum of mental and physical injury sustained by minor users and their families.

---

[14] *See* N.M. DEPT. OF JUSTICE, Attorney General Raúl Torrez Files Lawsuit Against Snap, Inc. To Protect Children from Sextortion, Sexual Exploitation, and Other Harms (Sept. 26, 2024), https://nmdoj.gov/press-release/attorney-general-raul-torrez-files-lawsuit-against-snap-inc-to-protect-children-from-sextortion-sexual-exploitation-and-other-harms/ ("An undercover investigation carried out by the New Mexico DOJ revealed a vast network of dark web sites dedicated to sharing stolen, non-consensual sexual images from Snap – finding more than 10,000 records related to Snap and CSAM [child sexual abuse material] in the last year alone, including information related to minors younger than 13 being sexually assaulted. Snapchat was by far the largest source of images and videos among the dark web sites investigated.").

v.    **Snap's business model is based on maximizing user screen time**

142.    Snap's revenue is based on users' screentime and engagement level on its platforms, which directly correlates with the number of advertisements that can be shown to each user.

143.    Accordingly, Snap makes a profit by finding increasingly dangerous ways to capture user attention and target advertisements to its users. Snap receives revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications.

144.    Snap also receives revenue from selling its users' data to third parties. To gain new users, Snap advertises its products as "free" and it does not charge users for downloading or using its products.

145.    To keep child users engaged, Snap uses unknown and changing rewards that are designed to prompt users to consume its social media products in excessive and dangerous ways.

146.    Snap knows, or should know, that its designs have created extreme and addictive usage by its minor users. Snap has intentionally designed its products to maximize users' screen time, using complex technologies (including algorithms) designed to exploit human psychology and driven by the most-advanced computer algorithms and artificial intelligence available to one of the largest technology companies in the world.

**E.    Incomplete Brain Development Makes Minor Users More Vulnerable to Manipulative Technologies and Malignant Social Media Influences**

147.    The human brain is still developing during adolescence in ways consistent with the demonstrated psychosocial immaturity of adolescents. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control. Snap knew or should have known this, and of the harmful effects of its product features.

148.    The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. Studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

149.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

150.    In late adolescence, brain maturation remains incomplete, particularly those aspects involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. The part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence.

151.    Product features Snap uses and distributes as part of its social-media products (including recommendation technologies and hidden rewards) are designed to exploit young users' incomplete development.

152.    Snap knows or should know that adolescent users are much more likely to become addicted to Snap's products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Snap also knows that young users of Snapchat are much more likely to sustain serious physical and psychological

harm through their social media use than adult users. Nevertheless, Snap knowingly designed Snapchat to be addictive to young users and failed to include safeguards to account for and ameliorate the psychosocial immaturity of those users.

**F.    Snap Used Knowledge and Tech for Profit over Safety, and Misrepresented and Downplayed the Risk of Harm to Kids Instead of Warning Child Users and Parents**

153.    Snap uses its technology and knowledge for assessment and advertising and revenue purposes but ignores or refuses to use the same knowledge to reduce underage users (12 and under) or to prevent harm to its other child users from adult predators or from addictive, self-destructive behaviors caused by its product.

154.    For example, in January 2018, major alcohol brands pulled advertising business from Snapchat based on information calling "into question the adequacy of self-reported age as the sole means of targeting alcohol advertising on Snapchat."[15]

155.    In order to win back these lucrative accounts, Snap invested significantly in its age-signaling technologies such that, by the end of 2018, Snap stopped relying on self-reported age for certain marketing purposes and, instead, ascertained the actual age of its users with a greater degree of certainty via various data points it collects:

> Since then, several alcohol companies – including beer company Heineken, owner of 250 brands, and spirits companies Mast- Jägermeister and Campari Group, maker of 50 brands like Campari, Aperol and SKYY Vodka – are bringing their ad dollars back to Snapchat, citing progress Snapchat has made in guaranteeing their ads won't be shown to minors. The progress has been attributed to Snapchat's move away from age-gating ads purely off of users' self-declared ages and, instead, factoring in things such as how long someone has been on the platform, the age of their closest friends and the type of content they view. If a user declares themselves as 25, for example, but their closest friends are all 13, that person will no longer be targeted with alcohol ads, according to Frank Amorese, media director at Heineken.[16]

---

[15] Leonie Roderick, *Diageo pulls ads from Snapchat over age verification concerns*, Marketing Week (Jan. 3, 2018), https://www.marketingweek.com/diageo-pulls-ads-snapchat-audience-safety-concerns/.
[16] Illyse Liffreing, *Snapchat lures back alcohol brands*, DIGIDAY (Oct. 31, 2018), https://digiday.com/marketing/snapchat-lures-back-alcohol-brands/; *see also* Robert Williams, *Report:*

156.    Snap refuses, however, to use this technology to protect underage users from accessing its product or to protect children from connecting with sexual predators or suffering the damaging emotional and psychological harms from its products.

157.    Snap, through its officers and executives, does so with malice and reckless disregard for these foreseeable harms to its users.

### i. Snap has ineffective age control

158.    Snap claims it does not distribute to anyone under the age of 13, and that parental consent is required for users under 18. But Snap's operations for verifying age, identity, or confirming parental consent fail by design and Snap regularly distributes its products to users it knows to be under 13 and/or under 18 and without parental consent, as it did with minors E.R. and N.S.

159.    Snap's executives have admitted that Snapchat's age verification "is effectively useless in stopping underage users from signing up to the Snapchat app."[17]

160.    A British report from March 2023 further supports plaintiffs' allegations that Snap is turning a blind eye to underage and unauthorized users. Ahead of Britain's planned Online Safety Bill, TikTok and Snapchat were asked how many suspected users under the age of 13 they had removed from their platforms in a year. TikTok reported that between April 2021 and 2022 it had blocked an average of around 180,000 suspected underage accounts in Britain alone every month (totaling around 2 million, in Britain, for a 12-month period). For this same time period, "Snapchat disclosed that it had removed approximately 60 accounts per month, or just over 700 total."[18]

---

*Alcohol brands return to Snapchat*, Marketing Dive (Nov. 1, 2018), https://www.marketingdive.com/news/report-alcohol-brands-return-to-snapchat/541119/.

[17] Isobel Asher Hamilton, *Snapchat admits its age verification safeguards are effectively useless*, BUS. INSIDER (Mar. 19, 2019), https://www.businessinsider.com/snapchat-says-its-age-verification-safeguards-are-effectively-useless-2019-3.

[18] Martin Coulter, *Exclusive: Snapchat kicks few children off app in Britain, data given to regulator shows*, REUTERS (Mar. 5, 2023), https://www.reuters.com/technology/snapchat-kicks-few-children-off-app-britain-data-given-regulator-shows-2023-03-03/.

161.    A source inside Snapchat confirmed: "It makes no sense that Snapchat is blocking a fraction of the number of children that TikTok is."[19]

**ii. Snap ignores its ineffective age control**

162.    Snap designs its account-opening process in a manner intended to create little-or-no barrier to underage use.  When a user signs up, the user is prompted to enter the user's birthday.  According to Snap, if a user enters a date of birth under the age of 13, Snap notifies the user that they need to be older to be eligible for Snapchat. But then Snap allows such a child to enter a new date of birth and proceeds to create an account for the child.

163.    Users have reported Snap allowing them onto the app despite inputting an age below 13. For example, in 2019, one member of British Parliament "said he had joined the app easily despite supplying a date of birth that indicated he was 12 years old."[20] On information and belief, it is possible that E.R. and N.S. did not even have to self-identify as 13 or older when opening their Snapchat accounts, which information will require discovery as E.R. and N.S. do not recall the exact information they would have input when opening their first Snapchat accounts at age 9 and 10 respectively.

164.    Snap also has several points of actual knowledge when a user lies about their age upon and/or shortly after account opening including, for example, Device ID, age-estimation technologies, and other processes used by Snap on the *back end* for marketing and product development—but ignored by Snap when it comes to basic consumer safety.

165.    Snap often has actual knowledge when its users use an incorrect birthdate because it uses technologies that enable it to ascertain or estimate the actual age of each user with reasonable certainty (referred to as approximate, estimated, or inferred age).  These are signals which tell Snap that a user is not the age the user stated upon account opening, which

---

[19] *Id.*
[20] *Snapchat under scrutiny from MP's over 'addictive' streaks*, BBC (Mar. 19, 2019), https://www.bbc.com/news/technology-47623626.

Snap has recognized as being a more reliable predictor of age than its single self-reporting question.

166.    On information and belief, Snap often turns a blind eye to the issue of underage and/or unauthorized use of its platform because enforcing its own terms would mean less revenue for Snap and its leadership.

### iii. Snap fails to obtain parental consent

167.    In February of 2024, and during other litigation (as reflected in public filings) Snap acknowledged that at all times relevant "Snap's Terms of Service prohibited users under the age of 18 from using Snapchat without obtaining a parent's consent," but that "Snap does not verify parental consent to use Snapchat."

168.    Despite claiming in its own terms that it prohibits use by children under age 13, Snap represents in the context of App stores—including Apple and Google—that its products are safe for users as young as 12.[21]

169.    At all times relevant and currently (as of March 4, 2025), Snap advertises itself in the Apple App Store and elsewhere as safe and appropriate for children "12+ Years Old."  Snap does this despite its own Terms of Use claiming to prohibit use by children under 13 years old, and prohibitions/rules imposed by the Children's Online Privacy Protection Rule ("COPPA"), 16 CFR Part 312, on use by children under 13 years old.

170.    Even though Snapchat is targeted at and marketed to children, Snap fails to actually obtain consent of parents or legal guardians for minors to use the product.  On information and belief, even when a parent reports or otherwise contacts Snap and notifies it of underage use, Snap engages in a pattern and practice of disregarding and/or failing to act on such reports.

---

[21] *See* SNAPCHAT APPLE APP STORE PREVIEW, *available at*
https://apps.apple.com/us/app/snapchat/id447188370 (last visited Mar. 14, 2025).

### iv. Snap purposely undermined parents' ability to prevent, monitor, or restrict children's use of Snap

171.    Section 230(d) of the Communications Decency Act requires that an interactive computer service provider "at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections."[22]

172.    Despite the Act's unambiguous provisions, Snap designed product features that *encourage and assist* children in evasion of parental oversight, protection, and consent, and it does so with features are unnecessary to the operation of these products.

173.    To make matters worse, in July 2022, Snap announced "Snapchat for Web." This new distribution method allows minors to access Snapchat without having to download the app onto their mobile device at all, *making it even easier for minors to access Snapchat without parental knowledge or consent*.

174.    Snap also designs its products in a manner that encourage and aid its youngest users in evading parental (and law-enforcement) oversight, including features and practices such as: (a) disappearing evidence (systems that do not preserve or destroy material evidence on the backend as well as the frontend); (b) the hard-to-find "My Eyes Only" encrypted data vault feature; (c) failure to provide customers with information on how to monitor or limit their children's use; (d) failure to close accounts and block access to minors when Snap knows or should know of lack of parental consent or underage status; (e) failure to notify parents or provide product features or tools for tracking when and how long minor users spend on the Snapchat product, and when minors are contacted or solicited by adult users; (f) failure to verify user emails or phone numbers; (g) allowance of multiple accounts,

---

[22] Communications Decency Act of 1996, 47 U.S.C. § 230(d).

despite claiming to prohibit multiple accounts; and (h) otherwise refusing to enforce its own age limitations and terms of use in any reasonable or meaningful manner.

176.   Moreover, despite a substantial portion of Snapchat's user base being under the age of 18, the platform did not have any parental control features from its launch in 2011 until August 2022.

176.   Snap ensures that parents have no reasonable or actual means to prevent such use.  Snap does not warn or disclose any of this to parents; such conduct is outrageous because many parents reasonably have no idea that their children are able to access Snapchat without their consent in the first place.

177.   On information and belief, there are millions of minors—including under the age of 13—to whom Snap is distributing its product without parental knowledge or consent.

178.   With failed systems to detect underage users, users without parental consent, and ineffective parental controls, parents are left with no tools to effectively stop or monitor their child's activity on Snapchat.

**v.     Snap failed to warn child users or their parents of the known risk of harm**

179.   Snapchat could only be used safely by children if child users and their parents were fairly warned about the threats from being connected with adult predators, of Snapchat's addictive nature, and the consequences of Snapchat use on the still-developing minds of children.

180.   Snap provides no warnings to parents about the risks of harm their children are exposed to on Snapchat on either its website or in its marketing, despite the fact that it markets widely, including through commonly used App Stores (frequently being featured as a recommended app, and placed next to games and similar child-appropriate apps), on billboards, and at popular events such as the Super Bowl.

181.   Snap provides few instructions or visuals on its website about how its product functions.  Presumably, the only way a parent could learn about Snap is by downloading it

themselves, thereby becoming a contractual user of the product and benefiting Snap as a direct result. But even then, Snap does not provide parents with information on how the product works or warnings relating to the harms its product causes.

182.    Snap also does not provide parents with an accessible and/or staffed reporting mechanism to report unauthorized use by minor children and did not sufficiently disclose or notify consumers about the defective and/or ineffective reporting mechanisms it put into place at all times relevant to this complaint.

183.    In fact, Snap has either implemented defective reporting mechanisms as a general practice, or purports to provide consumers with working reporting mechanisms and explicit promises that it will act on those reports, only to then ignore them for its own benefit.

184.    On information and belief, in addition to E.R. and N.S.'s own efforts to report harms on the Snapchat platform, it is very likely that Defendant Brandon Rhoades had been reported to Snap by other users and for violations of Snapchat's terms of service; that Snap had actual knowledge of these facts, but decided to ignore such knowledge in favor of engagement; and that, had Snap operated its reporting mechanisms in the manner it promised consumers—including E.R. and N.S.—they would never have been connected to Rhoades (or other predatory strangers) in the first place.

185.    Snap's age-verification systems and policies, and reporting mechanisms, are so defective—and the volume of its users under 13 is so high—that it is reasonable to conclude Snap deliberately chose to adopt and maintain these ineffective policies to facilitate underage use.

**G.    Snap Misrepresents the Safety of its Product**

186.    Snap not only failed to warn of known and foreseeable harms but it has devoted significant time and resources to convincing children, parents, and governments around the world that Snap is safe. It represented that Snapchat was not addictive or otherwise harmful and promised consumers that it was using all available technologies to keep kids safe on its platform.  The parent plaintiffs relied on Snap's representations and

publicly available materials when making the decision to allow their children's continued use of Snap's products, and the minor plaintiffs likewise relied on Snap's representations and direct communications with them when deciding to use Snapchat's products and when interacting with predatory Snapchat users to whom Snap incentivized them to connect.

187.    In an April 2021 Blog, Snap's Vice President of Global Policy, Jennifer Stout, identified herself as a parent equally concerned with the safety of Snapchat, "I spend a lot of time having these conversations with my own children." Ms. Stout further claimed that Snap's products are "designed differently" than other social media platforms, including that its "purpose is to design products and build technology that nurtures and supports real friendships in a healthy, safe, and fun environment."  Snap claimed that it is "an inherently different kind of platform," stating "[f]or us, nothing is more important than the safety of our Snapchat community, and we have always believed that we have a responsibility to help our community learn about how to protect their security, privacy, and wellbeing when using our products."[23]

188.    In truth, Snap ensures that there is no real way for parents to learn what Snap is doing—what products it is distributing to their children, how it has designed and programmed those products to target children, and the fact that Snap is the one facilitating, encouraging, and making connections between its youngest users and adult Snapchat users that these children have never met in real life.

189.    Snap may *look* different from some social media products. For example, it does not utilize a publicly viewable bulletin board format like Instagram or Facebook. However, Snap's use of this visual difference between products to claim that Snapchat is safer than Instagram and Facebook when, in fact, Snap is designing its entire platform in a manner intended to lull children into a false sense of safety and actively is connecting

---

[23] *See Snapchat, Privacy & Safety: The Basics*, SNAP INC., (Apr. 21, 2021), https://values.snap.com/news/snapchat-privacy-and-safety-the-basics.

children to predatory Snapchat users to increase its own engagement, is unfair, deceptive, false, and misleading.

>    **i.    Snap misrepresented harm and failed to warn of sexual predators**

190.    A recently filed Attorney General Complaint disclosed an internal Snapchat document in which a Snap employee reported that Snap was allowing accounts to stay active despite dozens of reports lodged against them, including for the specific types of harms at issue in this case.

> 8.    Instead of implementing additional safeguards to address the unique susceptibility of Snapchat, Snap has done the opposite. While recognizing the need to ensure that "user reports related to grooming and sextortion are not continuing to fall through the cracks" and that "no action is taken by agents" in instances where users report "being sextorted or asked for nudes (which we know is often the start of sextortion)," Snap also complained internally that identifying and protecting minors from sexually explicit content and predatory users would overburden its moderators, "create disproportionate admin costs," and should not be its responsibility. Snap employees pointed to a "case where an account had 75 different reports against it since Oct. '21, mentioning nudes, minors, and extortion, yet the account was still active."

191.    Not only did Snap refuse to protect minors from predators, it made connections between predators and minors more likely by encouraging and incentivizing young users to add new "friend" accounts.

192.    Snap exploits adolescents' need for social validation by incorporating social metrics into its product, such as the Snap Score. Adolescents are incentivized to add users they may not know in real life in hopes to increase their Snap Score or Story views. Further, once a user obtains a pre-determined quantity of friends and Story views, Snap promotes the user to a public profile, allowing them to obtain maximum visibility on Snapchat's "Discover" feed, an algorithmically derived feed.

193.    By incorporating social metrics into its products, Snap connects adolescents' vulnerabilities—social validation through comparison—to a dangerous feature that compels younger users to connect with strangers at an alarming rate, as some Quick Adds may include as many as 200 accounts.  In fact, to further encourage users to add these new "friends," prior versions of Quick-Add (now called "Find Friends") included a single-button option to "Add All," which added all of the Snap-recommended accounts to a user's account without the need to individually review and decide on which accounts to add.

194.    Snapchat encourages these connections between young users and what most often are strangers (people they have never met and do not know outside of the Snapchat platform) but does not provide any sort of warning when a user signs up and/or is presented with Quick Add recommendations.

195.    Snap could have warned children, and their parents, to carefully review the proposed new "friends," and, further, altered minor users and their parents that some Snap-recommended accounts could seek to exploit the user, or that the recommended accounts might be pedophiles.

196.    Instead, as set forth above and at all times relevant, Snap did the opposite—it actively worked to convince minor users to accept its recommendations to increase engagement, and then incentivized and rewarded dangerous adding, and otherwise engaged in the making of materially false and misleading statements to this end.

197.    As Snap well knows, because of its defects and/or inherently harmful designs, savvy pedophiles need only find one middle or high school student to add in order to gain access to all of the child user's friends and friends of friends via Snap's connectivity features.

198.    Snap incorporates these features into its accounts to generate profits. Its failure to disclose and warn users and parents of the known dangers and foreseeable consequences of its purposely dangerous product design was done with malice and reckless disregard to the safety of its users in order to drive revenue and profits.

### ii.    Snap misrepresents Snapchat's addictive design

199.    Snap affirmatively misrepresented the addictive and harmful design and operation of its social media products. Snap has represented to the public and governments around the world that its products are safe and not addictive.

200.    In making these representations, Snap actively concealed the dangerous and addictive nature of its products, lulling users and parents into a false sense of security. Snap plays down its products' negative effects on teens in public statements and advertising, makes false or materially misleading statements concerning its product's safety, and refuses to make Snap's research public or available to academics or lawmakers who have asked for it.

201.    During the relevant time period, Snap represented in public comments and via advertising, including billboards, third-party App Stores, during the Super Bowl, and in other high-profile venues, that its products are not addictive and were not designed to be addictive. Snap knew or should have known that those statements were untrue.

202.    Snap's own research revealed that its products were harmful to youth and created compulsive and excessive platform use. Snap knew its products were causing young users to engage in harmful behaviors and to make harmful connections.

203.    Snap has refused to disclose the harmful, addictive, and dangerous effects of it products or otherwise warn the public, its young users, or young users' parents.

204.    Snap could have fulfilled its duty to warn of these potential harms without referencing or deleting any content or acting as a publisher or editor of third-party content.

205.    Snap's misrepresentations and omissions were intended to and did affect consumers' decisions to use Snapchat.

## H.    Snap-Created Content Made Its Product Unreasonably Dangerous and Defective

206.    Snap-created content makes its products alarmingly addictive and dramatically increases the likelihood its child users will experience mental-health related

47

injuries and harms. In addition, Snap's own content encouraged and facilitated Rhoades' access and connection to E.R. and N.S. and materially contributed to his illegal conduct. Snap-created content makes its products unreasonably dangerous and defective.

207.    Snapchat is not exclusively an "interactive computer service." Rather, Snap actively participates in content creation on Snapchat through its features and algorithms. The platform's design, including Snap Map, Quick Add, and personalized content recommendations, directly shapes and generates user interactions and content. Snap's augmented reality filters and Bitmoji avatars are Snap-created content that users incorporate into their posts. Additionally, Snap's "For You" feed curates and presents content based on user behavior and preferences, effectively creating a unique content experience for each user. These elements demonstrate Snap's role as not just a passive host, but an active content creator and curator on its platform or "an information content provider."

     i.     **Snapchat lenses are Snap-created content**

208.    Snapchat Lenses are augmented-reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and include World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

209.    These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of a user's Snapchat posts.

210.    Frequently, the *only* content in a user's post are images, videos and audio content provided by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of users' Snapchat postings and becomes a co-publisher of such content. When malignant users incorporate images, Lenses, music, audio, and video content

supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Snap's platform.

211.    Snap also contracts for legal rights in its users' content, such that it is not "third-party content." Snap's current Terms of Service, for example, grant Snap "an unrestricted, worldwide, royalty-free, irrevocable, and perpetual right and license to create derivative works from, promote, exhibit, broadcast, syndicate, reproduce, distribute, synchronize, overlay graphics and auditory effects on, publicly perform, and publicly display all or any portion of your Public Content in any form and in any and all media or distribution methods" This effectively makes Snap responsible, in whole or in part, for the creation or development of information and makes Snap a co-creator or developer of content.

### ii.    Snapchat Bitmojis are Snap-created content

212.    Another example of Snap's role as an information-content provider is its Bitmojis product. Bitmojis are a  more-complex version of an Emoji. Emoji perform a similar function in online communications to that of small talk and non-verbal behavior in offline, ordinary speech—they can inject emotion, nuance, humor, and sociability. Just as non-verbal behavior such as pitch, volume, speed of speech, gestures, and facial expressions fundamentally informs our verbal communications, emoji can also improve one-dimensional texting and posting by adding emotion, sociability, and humor.

213.    When users create a Snapchat account, they are prompted to create a Bitmoji avatar that serves as their profile picture on Snapchat. Snapchat requires users to grant access to their camera and take a selfie. Snapchat then generates three cartoon-like renditions from the selfie. Users choose their favorite as their avatar.





Once an avatar is selected, the user can choose to edit Snapchat's pre-generated choices. Aspects of the avatar such as the color, size and style of hair, facial features, and clothing can be altered.



214.    Every Snapchat user's Bitmoji was created by Snapchat and is limited by the tools and processes Snap requires. In many instances Snap is creating the avatar itself, with little-to-no user input. Users can edit their avatar, but they remain a cartoon-like representation of themselves that is based on—and retains the character of—the original Snapchat avatar. User Bitmojis are Snap-created content.

215. In addition to creating the avatar, Snapchat also offers "Bitmoji Fashion" as outfit choices from which users can select to dress their Bitmoji. This is another aspect of the Bitmoji that is completely created and designed by Snapchat. Snapchat also offers a feature called Bitmoji Stories, a comic strip of the user's personalized avatar in different scenarios. Snapchat will often choose to feature a user's Bitmoji alongside a "co-star" Bitmoji of the last person with whom the user interacted. The Bitmoji Stories are similarly content that is completely designed and created by Snapchat.

 

216. Snapchat's Terms of Use specify that "Snap is the owner of the Services, which includes all related brands, works of authorship, Bitmoji avatars that you assemble, software, and other proprietary content, features, and technology." The Bitmojis are Snapchat content.

### iii.    Snapchat Cameos and Filters are Snap-Created Content

217. Snapchat also offers a feature called cameos, sticker-like images that are customized to feature the user's face. Snapchat generates cameos by inserting a selfie taken by the user into stickers that they designed. Users can send Cameos in chats or insert them into Snaps, making cameos a feature that frequent Snapchat communication and content.

Cameos are sometimes even used in Snapchat ads. Similar to Bitmojis, cameos are content that is created and designed by Snapchat. The images into which users' selfies are inserted are Snapchat's creation.



218.    Snapchat also contributes to the content creation process by supplying predesigned Snapchat stickers. The stickers are designed by Snapchat themselves, the text and aesthetic purely a Snapchat creation. These stickers are often featured in users' Snaps, as seen in the second two screenshots below, making Snapchat partly responsible for the creation of that content or a "content co-creator."



### iv.    Snap's filters and music are Snap-created content

219.    In addition to Bitmojis, cameos, and stickers, the filters offered to users as an overlay when taking pictures or selfies are another example of Snapchat's direct involvement in content creation on their app. While some of the filters are created by the users themselves, as seen in the image featuring the Pit Vapers filter by Tyler Crane, others are clearly labeled as being created by Snapchat, for example the funny strawberry filter or the light filter.

220.    In addition to creating the filters, Snapchat often pairs their filters with certain songs, a design choice that is made by Snapchat alone (as seen in the top center of the images below). Both the creation of select filters on Snapchat and the design choice to pair certain filters with certain songs on their application are examples of Snapchat creating and developing content on its own platform.



221.    As seen through the presence of Bitmoji avatars, cameos, stickers, filters, and music on the Snapchat application, Snapchat is much more than an interactive computer service. Snapchat is responsible, in whole and in part, for the creation and development of content on its platform, a reality which disqualifies Snap from benefiting from the immunity with which Section 230 has supplied it in the past.

222.    These are products and platform features Snap designs, creates, and distributes, in stark contrast to other types of neutral online platforms and technologies, and these products and features materially contribute to and cause the types of harm at issue.

**v.    Snapchat-created Bitmojis materially altered Rhoades's content and enhanced and facilitated his illegal conduct**

223.    Rhoades used Snapchat to locate, connect with, groom, and then assault N.S. and rape E.R.  Snapchat Bitmojis, and related features and tools, materially contributed to Rhoades's conduct. Rhoades's content, in part, was his physical appearance. Snapchat materially altered Rhoades's content by presenting him as a friendly and harmless-looking avatar. Snapchat materially contributed to and facilitated Rhoades illegal conduct by stripping him of the visual signals children, including N.S. and E.R., are taught to fear and associate with strangers and adult users.

224.    In a scholarly review of a sampling of criminal cases from diverse jurisdictions, researchers found that emoji are being increasingly recognized as a facilitator or adjunct to unlawful sexual solicitation made on online platforms.

225.    The central perceived attribute of Bitmojis—their cuteness and playfulness— makes them an ideal grooming tool to be used by those seeking to sexually exploit minors. The anonymity of Snapchat, combined with apparently innocent and benign Bitmoji, can mask criminal intent.  The use of Bitmojis to facilitate online communication makes messages friendlier and fun but these cartoonish images have a darker side that reveals their association with criminal behavior.

226.    Snap's choice to disallow photographs further normalizes and masks the potential danger of an adult that would choose to use a cartoon avatar to engage with children the adult does not know in real life.

### vi. Snapchat-created Bitmojis make potentially malignant actors appear innocuous and lovable

227. The Nobel prize winning ethnologist Karl Lorenz identified *Kindchenschema*—baby schema—that characterizes an infant's face: a protruding forehead, a large head, a round face, big eyes, and a small nose or mouth.[24] These features, when integrated, make a child's face appear to be cute, attractive, and lovable.

228. Lorenz posits that these cues are part of an innate releasing mechanism that automatically evokes humans to show liking and caring for the young. Subsequent researchers have found that baby schema influences appeal of not only infants' faces but also children's faces because facial cranial growth is gradual during early childhood and certain crucial infantile facial cues remain readily available during this period.[25]

229. Over the past decade, *Kindchenschema* has had a significant impact on online communication. A 2024 study by Japanese and Israeli researchers showed that avatars featuring baby schema features received higher ratings and were perceived as more "cute," "likable," "approachable," "pleasant," and elicited more positive emotions than neutral, mature avatar designs.[26] Participants from both Israel and Japan assessed the cute avatars, similarly, implying that utilizing cute avatar designs could encourage positive interactions across cultures in computer-mediated communication.

230. Snapchat Bitmojis imbue predators and malignant actors with benign and benevolent images providing a false sense of security to vulnerable users who encounter these actors on Snapchat.

---

[24] Karl Lorenz, *Die angeborenen Formen möglicher Erfahrung (The innate forms of experience)*, 5 Zeitschrift für Tierpsychologie, 235–409 K. (1943).
[25] Li Zhu Luo, Hong Li, Kang Lee *Are children's faces really more appealing than those of adults? Testing the baby schema hypothesis beyond infancy*, J EXP CHILD PSYCHOL. 110 (Sept. 2011)
[26] Shiri Lieber-Milo, Yair Amichai-Hamburger1, Tomoko Yonezawa, Kazunori Sugiura *Cuteness in avatar design: a cross-cultural study on the influence of baby schema features and other visual characteristics* AI & SOC. (2024)

231.    The following examples were created by taking photograph of notorious criminals and running them through the Snapchat Bitmoji which prompted and/or required the creation of a new and misleadingly benign images.

**Jeffrey Dahmer**



**R. Kelly**



**John Wayne Gacy**



**Adolf Hitler**



**Harvey Weinstein**



**Charles Manson**



232.    Snapchat Bitmoji are the proverbial sheep's clothing for predators and they are Snap-generated content.

I.    **Product Testing Confirms Dangerous Snap Messaging, Programming, and Lack of User Control – Snap Itself is Leading Minors into Danger**

233.    In June 2023, in response to claims Snap made in other litigation about how its Quick Add product worked, staff from the Social Media Victims Law Center purchased new cell phone devices and opened new Snapchat test accounts.  These devices each were purchased with a new phone number, and then a new Snapchat account was opened—identifying each time as a sixteen-year-old female—using an email address that had just been created on the new cell phone and the newly obtained phone number.  To be clear, this means that the device did not have any contacts whatsoever (or even contacts associated in any way with the email account that was used) and the self-identified sixteen-year-old, female user did not have any Snapchat friends at all—unless, of course, Snap is counting the cell phone service provider as a mutual contact and/or itself as a mutual Snapchat "friend."

234.    The first of plaintiffs' Quick Add test accounts was opened on June 2, 2023, and the second and third were opened on June 12, 2023.  These efforts, along with information Snap's My AI feature provided to two other, existing users about how it makes Quick Add connections, support plaintiffs' allegations that Snap is utilizing user data and/or other data points to intentionally pair strangers together, including minor users with predatory adults.  These tests further show how Snap controls the user experience for many self-identified minor users, and how it pushes those users into harms' way without the user having every searched, sought out, or otherwise operated the platform in any manner that could explain or justify the inherently dangerous recommendations Snap makes.

235.    Upon opening of the test account on June 2, 2023, the self-identified sixteen-year-old, female user disallowed Snap's request to sync contacts, then received more than 200 Quick Add recommendations from Snap within minutes of account opening.  Many of the usernames to whom Snap connected her appeared on their face to belong to predatory

users, which plaintiffs allege based on terms and emojis indicating sexual solicitation.  For example, the following is a screenshot of just some of the Quick Add request recommendations Snap generated and directed to this self-identified, sixteen-year-old user (with no contacts or Snapchat friends):



236.    A few days later, the user accepted several of Snap's Quick Add recommendations—from top to bottom—and began rapidly receiving requests to know whether she was real or fake, users asking her for nude photos, and explicit photos from adult male users. In one instance, one of Snap's Quick Add connections attempted to reach the user via a Snapchat video call.  She did not answer, and subsequently received a video of that adult, male Snapchat user masturbating. The user never responded to any of the snaps she received, she only opened what was sent to her based on Quick Add connections Snap made.

237.    On June 12, 2023, staff conducted a second test to make sure that the results of the first would be replicated.  This time, when the self-identified sixteen-year-old, female user went to open an account she observed a change in how Snapchat operated, specific to the Quick Add feature (as compared to the June 2 account opening). This time, after the user

disallowed Snap's request to sync contacts, Snapchat no longer provided access to its Quick Add product from that account (though the user was still given the option to re-select and choose yes). The Quick Add option on the second account was simply gone. Note, however, when the user re-opened this second account on June 27, 2023, the app directed her to Quick Add, even though she did not select yes to syncing contacts and still had no Snapchat "friends."

238. That same day, on June 12, 2023, staff conducted a third test to see whether the aforementioned Snapchat change (which appeared to have been made between June 2 and June 12) was merely cosmetic or if Snap actually made a product change to now limit its Quick Add connections to mutual contacts and Snapchat friends. On information and belief, that product change—if in fact, it was a change and not simply a glitch of some sort—was cosmetic. As soon as the user clicked "yes" to syncing contacts on the third account—and even though she once again had no contacts and no Snapchat friends—Snap again sent her over 200 Quick Add connection requests, and again, many of those were explicit on their face.

239. Snap later speculated in court that it was possible that the two new phone numbers had been recycled and that the Quick Add recommendations were the result of those recycled numbers having been previously connected to hundreds of Snapchat users. Not just connected, but presumably and to even be possible, the old numbers would have to have been still saved in the devices of those hundreds of (often predatory) Snapchat users.

240. On information and belief, that is not why Snapchat attempted to convince the test user through both accounts to connect directly with hundreds of adult strangers and is not why Snapchat made those particular recommendations to those particular accounts. There was no statement with each recommendation as to the basis for it, as Snap claims to always do, and if that is what had happened then Snap would have been able to confirm as much, rather than speculating. Moreover, young Snapchat users report regularly receiving Quick Add recommendations from Snapchat with no common "friends" or device contacts.

241.    Snapchat also encourages and incentivizes users to add new "friend" accounts in several ways.  For example, Snap exploits adolescents' need for social validation by incorporating social metrics into its product, such as the "Snap Score" (a numerical rating visible to a user's friends of how popular a user is on Snapchat).[27] Adolescents are incentivized to add users they may not know in real life in hopes to increase their Snap Score or Story views. Further, once a user obtains a pre-determined quantity of friends and Story views, Snap promotes the user to a public profile, allowing them to obtain maximum visibility on Snapchat's "Discover" feed, an algorithmically derived feed.

242.    By incorporating social metrics into its products, Snap connects adolescents' vulnerabilities—social validation through comparison—to a dangerous feature that compels younger users to connect with strangers at an alarming rate, as some Quick Adds may include as many as 200 accounts.  In fact, to further encourage users to add these new "friends," prior versions of Quick-Add included a single-button option to "Add All," which added all of the Snap-recommended accounts to a user's account without the need to individually review and decide on which accounts to add.

243.    Snapchat encourages these connections between young users and what most often are strangers but does not provide any sort of warning when a user signs up and/or is presented with Quick Add recommendations. There is nothing to suggest that a user should carefully review the proposed new "friends," that some recommended accounts could seek to exploit the user,[28] or that the recommended accounts might be pedophiles.

244.    Instead, as set forth above and at all times relevant, Snap did the opposite— it actively worked to convince minor users to accept its recommendations so that it could get

---

[27] Videos focusing on "How to Quickly Raise Your Snap Score" are popular across Snapchat and all social media.  One video on YouTube, for example, has 4.3 million views. FozTech, *How to Increase Snapchat Score Fast! (100% Works in 2023)*, YOUTUBE (Oct. 1, 2019), https://www.youtube.com/watch?v=m7s0hvQdTok.

[28] One commentator estimated that more than 50% of the "random" Quick Add friend requests he accepted immediately sent him explicit photos, tried to get him to sign up for websites selling explicit photos, or otherwise tried to scam him. James McAllister, *Why Random People Are Adding You On Snapchat (And How To Stop It)*, JAMES MCALLISTER ONLINE, https://jamesmcallisteronline.com/random-people-snapchat/ (last visited Apr. 18, 2023).

more engagement, and then incentivized and rewarded them when they did, and otherwise engaged in the making of materially false and/or misleading statements for these purposes.

245. In January 2022, after the time period at issue in this complaint, Snap announced a change to its Quick Add feature such that users who self-identified as 13 to 17 years of age would need to have "multiple" "friends" in common before the user would be suggested as a "friend" through Quick Add.[29] Snap did not specify how many "Friends" they would need to have in common before being algorithmically "matched."[30]

246. Moreover, and as Snap knows, because of its defect and/or inherently harmful designs, savvy pedophiles need only find one middle or high school student to add in order to gain access to all of their friends and friends of friends via Snap's connectivity features. This is particularly true since Snap uses dark patterns and harassment techniques to gain access to minor users' device contacts. This is illustrated by the tests described above, including that when the test user declined to "Allow" Snap the requested access, it asked several times and then subsequently when the account was opened.

247. Moreover, while Snap now claims that "users under the age of 18 cannot be directly contacted on Snapchat by unknown users who simply obtain their usernames," that statement also appears to be misleading. For example, Snap sent the following Snapchat communication to a self-identified minor (test account) even after it claimed to have made product changes:

---

[29] *See, e.g.*, Andrew Hutchinson, *Snapchat Adds New Limits on Adults Seeking to Connect with Minors in the App*, SOCIALMEDIATODAY (Jan. 18, 2022), https://www.socialmediatoday.com/news/snapchat-adds-new-limits-on-adults-seeking-to-connect-with-minors-in-the-ap/617310/.
[30] *Id.*



248.    On information and belief, Snap did not always provide the Report or Block option seen above. Regardless, even after Snap claimed to be taking proactive safety measures, more than one test account received a message like this, which Snap-generated message both encourages the adding of these strangers "so they can see your Story!" and provides minors with a tool that allows strangers to obtain direct access to them, even when not already accepted as a "friend."

249.    Snap's content-recommendation technologies also serve no countervailing benefit to consumers. Users are perfectly capable of running their own searches, as they do with any number of available search engines. And if the harmful third-party content were being provided in that manner—*i.e.*, if this was content requested and sought out by users as opposed to content identified and force-fed to users by Snap as a means to make Snap more money—it would not be at issue in this case.

**J.    Snap Directly and Proximately Caused Harms to Plaintiffs, including Aiding and Abetting Brandon Rhoades, Who Caused Additional Harms to E.R. and N.S. in 2020.**

250.    E.R.'s cousin helped her make an account when she was nine. E.R. was attracted by the filters. In 2018, when E.R. was 10, she created her own Snapchat account.

251.    N.S. started using Snapchat in 2018. She was 10 years old and in 5th grade. Snapchat was very popular at her middle school and among her friends. She wanted to be able to chat with her friends, and send Snaps, and also use Snapchat's filters like the rest of the kids.

252.    A.L. learned that E.R. was using Snapchat when E.R. was around 10 or 11 years old.  She noticed some kind of silly filter app and looked into it.  She had heard about Snapchat, including from Snap's commercials and marketing efforts.  But she also then went online and looked it up, so that she could make sure it was safe for her child to use.  Snap's own online materials represented that Snapchat was fun and safe for kids. Snap further claimed that Snapchat was designed to allow children to connect with people they knew in real life and not strangers. Snap's representations put A.L at ease so she let E.R. continue to use Snapchat.

253.    However, A.L. told E.R. to keep her Snapchat information private and explained that she should not talk to or accept anything from strangers.

254.    A.L. did not know or suspect that Snap was not only matchmaking for predators with her daughter's data but was actively working to convince E.R. that these other users were not strangers and, instead, were her "friends."

255.    E.R. and N.S. believed, based on Snapchat's advertising, its bright colors, and representations that Snapchat was for kids like them.  They knew about the funny filters and Snap's claims that its products were for friends to stay connected, and those were the only reasons they had any interest in using Snapchat.  They would not have started using Snapchat had Snap disclosed the truth about its products and the risk of harms to young users.

### i.  Snap knew that E.R. and N.S. were minors

256.    At all times relevant, Snap knew that E.R. and N.S. were minors.

257.    Snap knew that E.R. and N.S. were minors because E.R. and N.S. told Snap that they were minors. In addition Snap had sophisticated age verification technology to appease its alcohol advertisers, and access to multiple data points, including account longevity, friends' ages, and content preferences.

### ii.  E.R.'s and N.S.'s behaviors and interests changed after they began using Snapchat

258.    Before their Snapchat use began, E.R. was a competitive gymnast and took Mandarin classes.  She loved spending time with friends and would walk to the frozen yogurt store nearby to hang out on sunny days.  She was happy and outgoing, and interested in the world around her.

259.    E.R. and N.S. loved playing Animal Jam and would often go to the arcade where their parents would let them play games that resulted in tickets they could cash in for cheap, plastic toys and stuffed animals.

260.    At that time—when both girls were 10—neither had yet shown an interest in boys, or had any knowledge about sex, drugs, or other, more mature topics. They did not search for such topics on Snapchat.

261.    E.R. gradually lost interest in gymnastics and Mandarin.

262.    E.R. and N.S. stopped spending as much time with their friends and instead spent as much time as possible on their devices. They were spending several hours a day using Snapchat, and concealing their use from their parents.

263.    They went from loving Barbie, My Little Pony, and Shopkins to obsessing over Ulta Beauty and Sephora, fashion, and makeup.

264.    Within a year after they began using Snapchat, E.R. and N.S. began suffering from common social-media-addiction-related harms. They were losing sleep or simply choosing not to sleep. They stayed up late using Snapchat or woke up at night and began

using it. Snap inundated E.R. and N.S. with push notifications, which had the intended effect of pulling them back onto Snapchat—at the expense of their health and wellbeing.

### iii. **Snapchat caused physiological and emotional harms**

265.    Sleep deprivation led to more significant mental health harms such as anxiety, depression, moodiness, and inability to regulate their emotions.

266.    N.S. was often tired during the day and began struggling more with school and interpersonal relationships.

267.    E.R. developed an eating disorder and began experiencing thoughts of self-harm.

268.    E.R. withdrew and lost interest in activities she had always loved, so that she could spend more time using Snapchat.

269.    E.R. and N.S. likewise became dependent on Snap's features.

a.    Snap Score: This publicly visible metric became a source of intense competition and anxiety for N.S. She spent countless hours on the app trying to increase her score; this feature exploited her vulnerability and encouraged excessive use.

b.    Friend Emojis: These designations, which indicate closeness with other users, caused significant emotional distress for N.S. The feature created pressure to maintain certain interactions, disrupting real-world friendships and causing anxiety when Snapchat signaled changes in relationship status.

c.    Disappearing messages: This feature created a false sense of security, encouraging E.R. and N.S. to share sensitive content they believed would vanish, exposing them to exploitation and blackmail.

d.    Quick Add: This feature exposed E.R. and N.S. to strangers, including predators, increasing their risk of harmful interactions.

e.  Filters and lenses: These features contributed to body image issues for E.R. and N.S., negatively impacting their self-esteem and mental health.

270.  On information and belief, Snap also designed and programmed things such as the speed of its algorithms and hidden rewards in its efforts to addict young users. N.S. would often stay up late or wake up after her mother had gone to bed to use Snapchat. Even when she knew she needed to sleep and wanted to sleep, she could not help herself.

271.  At all times material, Snap knew that a significant number of minor users felt that they could not stop using Snapchat and that such "problematic use" was interfering with education, interpersonal relationships, and ability to sleep, among other things. Indeed, it specifically designed certain products to hook young users, using a variety of extended-use and gamification designs. These harms were known to Snap, but not ordinary consumers.

272.  Snap uses product features it knows or should know manipulate young and adolescent users in ways intended to increase use of its app. Snap knew or should have known that its product features harm children and teens. Snap knows it could make small adjustments to its features that would mitigate harms to minor users like E.R. and N.S.

273.  Snap could have altered its design to minimize the risk of harm without altering user content.

274.  Snap knew or should have known a causal relationship exists between young and adolescent users' screen time and psychological injuries and emotional harm. With malice and intent, Snap's officers and executives continued to use and employ its dangerous product features in order to increase user screen time and generate revenue and profits.

   iv.  **Snapchat convinced E.R. and N.S. to connect with strangers and match-made for predatory users**

275.  At the same time Snapchat was causing harm from increased anxiety and interfering with their education, interpersonal relationships, and ability to sleep, Snap was also actively targeting E.R. and N.S. with deceptive efforts to increase engagement with other users, including with other Snapchat users E.R. and N.S. did not know in real life or

even, in some cases, have any mutual acquaintances, and then pushing Snap's recommendations to connect to "friends" via its Quick Add product.

276.    Snap's Snap Score feature manipulates minor users into using the Quick Add feature by gamifying interaction.

277.    Snap began pushing E.R. and N.S.'s data to other Snapchat users who were strangers. Snap knew or should have known it was connecting adult strangers who might be predators to children, including E.R. and N.S.

278.    Specifically, by Snap pushing out their E.R.'s and N.S.'s data to predatory users, E.R. and N.S. became identifiable to those predatory users, and began receiving unsolicited communications from people E.R. and N.S. did not know.  Snap designed its products to enable and permit such direct communications, even to self-identified minors from self-identified adults.  In fact, to the best of E.R. and N.S.'s knowledge, not being contacted by strangers was not even a setting or option that they could select.  E.R. and N.S. would have selected such a setting if they could have.

279.    Both young women received countless unsolicited communications, as well as Snaps and videos, from predatory strangers that were able to find them because of choices Snap made—both the Quick Add recommendations that Snap convinced them to accept and random people that neither had added.

   v.    **Snap forced minor users to open Pandora's box**

280.    Snap also designed its product and interface output in a manner that is harmful to young users in these situations.  Specifically, at the time, Snap did not allow users to preview media received by users.  There was no way to anticipate what a user would see when a user opened something sent by another Snapchat user, it would simply expand onto the screen. Snap has since changed that product feature as it relates to Snaps, specifically, you can half-swipe and preview without fully opening.  However, and to the best of plaintiffs' knowledge, that change was not made until a year or two ago.

281.    E.R. and N.S., like many young Snapchat users, also tried blocking and even reporting some of these predatory Snapchat users to Snap. These product features were defective, however, and users could simply open new accounts to get around a block while Snap ignored violation reports as a matter of how it chose to operate its reporting mechanisms.  Snapchat did not respond or otherwise step in, despite its actual knowledge of attempted exploitation occurring in connection with minor users and so, like many children, E.R. and N.S. eventually stopped trying.  Because of their harmful dependency on Snap's products, however, stopping use was not something they were physically able to do.

### vi.    Snap used social pressure to push predators

282.    E.R. and N.S. further accepted Snap's Quick Add recommendations and related requests from other users in reliance on Snap's assurances that this was safe and fun.

283.    Like many young users, N.S. often would just go through Snap's Quick Add recommendations and add them all.  These were people Snap said she would probably like and that they were "friends."

284.    E.R., on the other hand, would often not add "friends" unless Snap told her that they had "friends" in common. Snap would tell E.R. that she had a certain number of "friends" in common, which made it feel safer than if she did not have "friends" in common. What E.R. was too young to understand and what Snap did not explain or warn her about was that often these "friends" in common were the result of things like Snap's Quick Add recommendations and it obtaining access to her device contacts.  That is, and as Snap knew but E.R. did not, all a predator had to do was connect with one or two children and all of a sudden, they had "friends" in common with countless others.

285.    There were safeguards Snap could have provided to minor users to prevent this, but it chose to not do so and instead, continued to market its products as safe.

286.    Snap knows that kids do not understand these dangers, as that is what makes its designs so effective at convincing young users to constantly engage.

287.    In these ways, Snap not only failed to warn E.R. and N.S. of the dangers but stripped its products of any indication of danger.  While adults and first responders that visit schools were telling children to not talk to strangers, Snap decided to call and make these strangers look like "friends." Snap turned connecting with strangers into a game, just like the ones that give kids tickets and cheap plastic prizes.

### vii.    Snap did not provide any warnings to minor users or parents

288.    Snap did not warn plaintiffs about any of the above defects and/or inherent dangers.  On the contrary, it repeatedly told them that its products were safe and fun for children, placed a 12+ rating in third party app stores, and marketed them to kids.

289.    Plaintiffs reasonably relied on Snap's representations, which Snap knew to be false and/or materially misleading, and were made for the purpose of ensuring that consumers, like and including these plaintiffs, would continue using its products.

290.    Looking back, plaintiffs can think of several warnings Snap could have provided but did not.  This includes things like:

a.  Snapchat is designed to be habit-forming and may interfere with sleep and other necessary daily functions.

b.  Snapchat is not safe or appropriate for children.

c.  Snapchat is not limited to people you know in real life, and our Quick Add recommendations and other features may connect you with strangers.

d.  Snapchat users you do not know are not your "friends" in real life, and connecting with them could be dangerous.

e.  Snapchat often does not act on reports of violations or other harms, such that our recommendation to connect with someone may not be safe and does not mean that the user we recommend has not violated our terms.

f.  Accepting Quick Add recommendations for users you do not know in real life may result in the receipt of unwanted explicit material and other harms.

g.  Opening a Snap or other communication from someone not connected to you already may result in the receipt of unwanted explicit material.

h.  Snapchat does not provide settings or options to protect against the above harms.

291.    These are just a few examples and had Snap provided warnings like those above or anything like them, millions of consumers would have made the informed decision to not allow their children to use Snap's products.  A.L. and N.D. would have said no.

**viii.    Snap connected E.R. and N.S. to the Individual Defendant**

292.    Snap exposed E.R. and N.S. to defective and/or inherently dangerous products and features, created harmful dependencies on its products, then trafficked them through complex and proprietary user-recommendation technologies for Snap's own financial gain. Snap took and used their personal information, without their knowledge or consent, and used and disseminated or otherwise made that personal information available to third parties—including predatory strangers.

293.    Snap designed, programmed, and operated Snapchat in a manner that actively exposed and connected E.R. and N.S. to predatory users, as described in more detail above, and Snap had actual knowledge of the harms its design, programming, and operational decisions were causing. It stayed the course regardless.

294.    As the foreseeable consequence of Snap's actions, E.R. and N.S. were exploited and sexually abused by Brandon Rhoades. Their encounter with Rhoades had a severe impact on E.R. and N.S's mental and physical health, and their emotional and social functioning. They had increased trouble regulating their emotions, heighted anxiety, depression, and feeling of shame, guilt, and embarrassment. They missed extended periods from school and withdrew emotionally from the people that cared about them. A lengthy criminal investigation and proceeding slowed the healing process and created additional anxiety and stress.

**K.      The Snapchat App is a Product**

295.    Snapchat identifies itself as a "product" and is treated as a product by ordinary consumers. Snap has repeatedly and consistently acknowledged that Snapchat is a "product."

296.    In public statements, Snap founder and CEO Evan Spiegel has admitted that Snapchat is a product: "In terms of the execution, we have to continue to evolve and iterate the product to get the result we are looking for." [31]

297.    Snap designed, coded, engineered, manufactured, produced, assembled, and placed Snapchat into the stream of commerce.  Snapchat is made and distributed with the intent to be used or consumed by the public. Snapchat is uniform and generally available to consumers. It can be obtained in Apple and Google app stores, and it is available on the internet.

298.    Snapchat is mass marketed.  Snapchat is designed to be used and is used by hundreds of millions of consumers. In fact, Snapchat would have little value if used by one or only a few individuals. Snapchat is advertised in a variety of media in a way that is designed to appeal to the general public and in particular adolescents.

299.    Snapchat is akin to a tangible product for purposes of product liability law. Snap can be heard and seen.  It takes up memory and depletes battery life. Snap can be turned on and off. It can be moved from one screen to another. When installed on a consumer's device, it has a definite appearance and location and is operated by a series of physical swipes and gestures.  It is personal and moveable. Downloadable software such as Snapchat is a "good" and is therefore subject to the Uniform Commercial Code. It is not simply an "idea" or "information."

300.    Snap is available at two main retailers, Google Play and Apple's App Store. At these retailers, the copies of Snapchat available to the public are uniform and not customized by the manufacturer in any way.

---

[31] Recode Staff, *Full video and transcript: Snap CEO Evan Spiegel at Code 2018*, Vox (June 8, 2018), https://www.vox.com/2018/5/30/17397120/snap-ceo-evan-spiegel-transcript-code-2018.

301.    Since its inception in 2011 Snap's leadership designed and re-designed new product features in what became an epic race with competing social-media manufacturers to increase popularity among America's youth and secure the title of go-to app for tweens, teens, and young adults. Snap is known within the industry for being an innovator whose product ideas other companies like Meta steal.

302.    The following is a product innovation timeline, illustrating Snap's evolution over time from a relatively simple product to one with several different (and dangerous) product features:

303.    In 2012, Snapchat launched on Android and added video capabilities, pushing the number of "snaps" to 50 million per day.

304.    In 2013, Snap added its "Chat" and "Stories" features—skyrocketing Snap's popularity among American youth and "changing the face of social media timelines forever."[32] This same year, Instagram launched Instagram Direct in an effort to compete with Snapchat's photo messaging platform; and in response to that, Snap launched filters, timestamps, temperature and speed overlays, and Snap replays.

305.    In 2014, Snap added text conversations, live video chat capabilities, "Our Story," Geofilters, and Snapcash.  Chat allowed users to talk to one another in the chat window via live video chat, a feature that is appealing to predators as it means no evidence— no call logs or text message trails that can be used by parents or the police. Snap does not limit use of that product, or any of these products, to adult users.  Snap also does not widely advertise these products, such that most parents do not know they exist.

306.    By 2015, Snapchat had over 75-million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snap then introduced Discover ("a fun and

---

[32] *See* FrozenFire.com, *A Brief History of Snapchat*, https://frozenfire.com/history-of-snapchat/ (last visited Mar. 14, 2025) (noting that in 2013, "Snapchat Stories launches, changing the face of social media timelines forever").

interactive source of content from media partners such as National Geographic, Comedy Central, CNN, and more"), QR code incorporation, and facial recognition software, and began its monetization strategy. Snap also launched several "hilarious animated selfie lenses" in 2015.   Advertisements were now a huge source of Snap's revenue—according to company financials, they made up 99% of total revenue.

### COUNT I — STRICT PRODUCT LIABILITY: FAILURE TO WARN

307.   Plaintiffs incorporate all prior paragraphs.

308.   Snap failed to warn child users and their parents about the dangers of Snapchat posed by sexual predators and the app's addictive design features. Snap's failure to warn child users and parents of these harms made Snapchat unreasonably dangerous and proximately caused injuries to E.R. and N.S.

309.   Snap's products are unreasonably dangerous and defective without a warning due to the likelihood that, by design, Snap will direct and encourage child users to connect with unknown adult users and because sexual predators use Snapchat to target children facilitating child sexual abuse under 12 V.S.A. § 522.

310.   Snap's products are also unreasonably dangerous and defective without a warning because they are designed to be addictive and contain features that are manipulative, coercive, and harmful and known to cause severe mental and emotional harm to child users.

311.   Snapchat was unreasonably dangerous when it left Snap's control, reached the user or consumer without substantial change in the condition in which Snapchat was sold, and was a cause of plaintiffs' injuries.

312.   As a result of Snap's failure to warn, E.R. and N.S. were sexually abused and exploited and suffered significant physical and emotional harm and hardship.

313.   Snap's actions in intentionally distributing its products to minors without a warning were those of its governing officers or agents lawfully exercising their authority or were ratified by its governing officers. Snap at all times acted with bad motive and malice

and with the hope of increasing its user numbers and profit at the expense of the health, safety, and welfare of its child users.

## COUNT II — NEGLIGENT FAILURE TO WARN

314.    Plaintiffs incorporate all prior paragraphs.

315.    At all relevant times, Snap owed a duty to exercise reasonable care and caution for the safety of individuals using its products, such as E.R. and N.S.

316.    Snap owed a duty to exercise ordinary care in the manufacture, marketing, and distribution of its products, including a duty to warn minor users and their parents of hazards that Snap knew or should know to be present, but not obvious, to underage users and their parents.

317.    Snap knew or should have known that its products unreasonably expose child users to predatory adults and create risk of sexual exploitation and abuse.

318.    Snap knew or should have known that its products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

319.    Snap was negligent in failing to provide adequate warnings about the dangers associated with the use of its social-media products and in failing to advise users and their parents about how and when to safely use Snap's social media platforms and features.

320.    Snap was negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of its social-media products.

321.    Snap could have fulfilled its duty to plaintiffs without changes to any third-party content and without conducting a detailed investigation.

322.    Reasonable users (and their parents) would not expect that Snap, or its products, would knowingly expose them to such risks and dangers and/or that Snap's products would direct them to harmful users at all, much less in the manipulative and coercive manner that Snap's products do.

323.    As a result of Snap's negligence, E.R. and N.S. were sexually abused and exploited, and left for dead.

324.    As a result of Snap's negligence, E.R. and N.S. suffered severe mental harm, emotional distress, physical harm, and pecuniary hardship.

325.    Snap's actions were those of its governing officers or agents lawfully exercising their authority or were ratified by its governing officers. Snap at all times acted with bad motive and malice and with the hope of increasing its user numbers and profit at the expense of the health, safety, and welfare of its child users.

### COUNT III — STRICT PRODUCT LIABILITY: DESIGN DEFECT

326.    Plaintiffs incorporate all prior paragraphs.

327.    One who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

328.    Snap's products are dangerous to an extent beyond what is contemplated by the ordinary consumer, with ordinary common knowledge, who purchase them because Snap's social-media products are designed to be addictive to minor users; Snap actively markets to minor users; and because the foreseeable, and intended, use of Snap's products cause mental and physical harm to minor users.

329.    Snap's products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Snap solely to increase the profits it derives from each additional user and the length of time it could keep each user dependent on its product.

330.    Snap's design was unreasonable dangerous and defective because it:

    a.  failed to provide parents the tools to ensure its social media products are used in a limited and safe manner by underage users;

78

b. failed to provide users and parents with reasonable and effective reporting mechanisms;

c. failed to enforce its own terms of service upon notice of illegal conduct and/or violations of terms—failures that resulted in harm to other users, including minor users who should not have had access to Snap's products in the first place;

d. designed its Bitmoji feature in a manner that allows (even requires) predatory adults to use Snapchat to create false and deceptive images that disguise predators' actual age and true identity to lull vulnerable minors into a false sense of security;

e. purposely designed products to frustrate the exercise of parental responsibility by its minor users' parents when parents have a right to monitor their children's social media activity to protect them from harm; and

f. purposely designed Snapchat's Bitmoji feature in a way that materially contributes to unlawful activity by assisting predators in gaining the trust of their child victims and commencing the grooming process.

331.    Snap's products are defective and dangerous because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Snap and the omission of the alternative design renders the product not reasonably safe.

332.    These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Snap's control, reached the user or consumer without substantial change in the condition, and its defective condition was a cause of Plaintiffs' injuries.

333.    It is feasible to design technologies that do not lull minor users into a false sense of security and do not direct minors to harmful content, and Snap could do so without altering, modifying, or deleting any third-party content posted on Snapchat.

334.    The cost of designing these products to incorporate such safeguards would be negligible while the benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

335.    Reasonable users (and their parents) would not expect that Snap, or its products, would knowingly expose them to such risks and dangers and/or that Snap's products would direct them to harmful users at all, much less in the manipulative and coercive manner that they do.

336.    As a proximate result of these dangerous and defective design attributes of Snap's products, E.R. and N.S. suffered severe mental and physical harm.

337.    Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design attributes in Snap's products until recently.

338.    Snap's actions were those of its governing officers or agents lawfully exercising their authority or were ratified by its governing officers. Snap at all times acted with bad motive and malice and with the hope of its increasing user numbers and profit at the expense of the health, safety, and welfare of its child users.

### <u>COUNT IV —</u>
### VIOLATION OF THE VERMONT CONSUMER PROTECTION ACT (VCPA)
### (9 V.S.A. § 2451, et seq.)

339.    Plaintiffs incorporate all prior allegations.

340.    Snapchat engages in extensive commercial activities by offering advertising services to businesses. The platform allows companies to create and publish ads, targeting Vermont consumers. Thus, Snap engages "in commerce" in Vermont.

341.    Plaintiffs are "consumers" as that term is defined in 9 V.S.A. § 2451a(a) in relation to Snapchat.

342.    Snap meets the definition of "other violator" as that term is used in 9 V.S.A. § 2461(b) and has been further developed under Vermont case law.

343.    The VCPA prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a).

344.    By engaging in the acts and practices more fully described above, Snap has violated the VCPA by, among other things: (1) by marketing and representing their products as being safe for minor users when Snap knew or should have known that their social media products were harmful to a significant percentage of their minor users; (2) by failing to redesign their products to limit the potential harms or warn minor users and their parents of the dangers inherent in the foreseeable use of their products; (3) by promoting, marketing, and advertising their social media products to minors, despite the knowledge of the specific dangers the product posed to minors, including, but not limited to, the likelihood of sexually predatory contact and communication from adult users; and (4) by affirmatively promoting their social media products as being safe to minor users through the use of cartoons, Bitmojis, and associated features designed to appeal to minors and younger users, which provided minor users and their parents with a false sense of security, despite Snap's knowledge of the harms and dangers the platform posed to minors.

345.    Snap failed to disclose or falsely denied that Snap's design features connected young users to unknown adults and to sexual predators.

346.    Snap failed to disclose or falsely denied that Snap is designed to get users to spend more time on its app and that its research, or research it had knowledge of, showed its app to be addictive.

347.    If Snap publicly disclosed the known risks of harms to child user and parents, many consumers, including plaintiffs, would likely have rejected its product, or at a minimum, taken acts to protect themselves and their children from the disclosed risk—including from sexual predators.

348.    The unfair and/or deceptive acts or practices of Snap were a proximate cause of the substantial harms suffered by the plaintiffs, A.L. and E.R. and N.D. and N.S.

349.    As a result of Snap's unfair and/or deceptive acts and practices the plaintiffs have sustained an ascertainable loss.

350.    Snap's acts and omissions as alleged in this complaint demonstrate a flagrant disregard for human life and safety, malice, and aggravated and egregious fraud, so as to warrant the imposition of exemplary damages under Vermont's Consumer Protection Act.

### COUNT V — UNJUST ENRICHMENT

351.    Plaintiffs incorporate all prior paragraphs.

352.    Snap derived a benefit in the form of advertising revenue from each user, including E.R., N.S., and Rhoades, and from the time each user spends using Snap. As a result, and to inflate its user numbers and profits, Snap knowingly allows underage, unauthorized users to create accounts.

353.    To maintain user numbers and revenue, Snap turned a blind eye to a sub-group of predatory users, including Rhoades, who spent much of their time on Snapchat targeting children for abuse.

354.    Snap knew that underage users, including E.R. and N.S., could be harmed by its dangerous, addictive product, and by sexual predators enabled and assisted by Snap.

355.    Snap engaged in this conduct with malice and reckless disregard for the safety of users like E.R. and N.S., and for with the express purpose of generating additional revenue at the direct expense of physical and mental well-being of E.R. and N.S.

356.    Inequity and injustice will result if Snap retains the ill-gotten benefits at plaintiffs' expense, in light of Snap's acts and omissions described herein.

### COUNT VI — NEGLIGENT, DANGEROUS DESIGN

357.    Plaintiffs incorporate all prior paragraphs.

358.    Snap owed a duty of ordinary care to design its product in a way that did not unreasonably expose users to foreseeable harm from the foreseeable uses of its products.

359.    At all times material, Snap knew or should have known that as designed, Snap's products were unreasonably dangerous in that they exposed young and minor users to harm from sexual exploitation and assault, and that Snapchat's manipulative, addictive product features unreasonably exposed young and minor users to psychological and emotional harm.

360.    Snap requires users to use Snap's Bitmoji tool and features which are designed to make all users appear safe, friendly, and inviting; Snap thereby convinces young users they are safe—and convinced E.R. and N.S. they were safe—on the Snapchat platform.

361.    Through its "Quick Add" feature, Snapchat then recommended E.R. and N.S. to the same adult Snapchat users that Snap told them were their "friends" and "people you may know," and for which Snap created or required predators to appear as Bitmoji, cartoon avatars, designed to make them appear safe to E.R. and N.S.; Snap likewise encouraged these predators to connect with E.R. and N.S.

362.    Snap features then tell and convince young users—and told and convinced E.R. and N.S.—that interacting with strangers is not dangerous at all, but instead, that these strangers are actually "friends" and "people you may know."

363.    Snap knew or should have known that by designing and distributing its Snapchat product with these specific features, the app was unreasonably dangerous because it exposed female children to adult-male sexual predators.

364.    In addition, Snap designed Snapchat to maximize user engagement through features like disappearing messages, Snap Map, Quick Add and other features.

365.    Snap knowingly designs and includes in Snapchat product features that encourage addictive behavior and harmful social comparisons for child users. Snap knew or should have known these product features were likely to cause mental and emotional harm to its young users.

366.    Snap failed to act reasonably in the design of Snapchat and its features and breached its duty to the minor plaintiffs.

367.    There were feasible and inexpensive alternatives that Snap could have employed to make its products reasonably safe, and Snap breached its duty of care by failing to incorporate them into its product designs.

368.    Snap's actions were those of its governing officers or agents lawfully exercising their authority or were ratified by its governing officers. Snap at all times acted with bad motive and malice and with the hope of increasing user numbers and profit at the expense of the health, safety, and welfare of its child users.

369.    As a direct and proximate result, Snap caused plaintiffs' injuries.

## COUNT VII — AIDING AND ABETTING

370.    Plaintiff incorporates all prior paragraphs.

371.    At all relevant times, Snap knew its Snapchat app played a material role in the sexual exploitation and assault of its child users by first connecting them with unknown adult predators via its "QuickAdd" feature and by then disarming the young user by presenting sexual predators as fun and likeable Bitmojis avatars.

372.    Snap knew it was affirmatively connecting child-female users with unknown adult-male users and encouraging them, through Snap's own statements, to accept such "friend" connections, thereby setting up minor users to be sexually exploited, assaulted and battered.

373.    On information and belief, Snap knew that sexual predators were utilizing Snapchat's unique features to gain access to potential child victims and to then gain the children's trust and groom them through its Bitmoji feature.

374.    Rhoades knew Snapchat's features could connect him with young girls, and he used Snapchat to make connections with unknown young girls in his area, including N.S. and E.R., that he hoped to sexually exploit, abuse or batter.

375.    Rhoades knew that because Snapchat presented him to young girls as a Bitmoji avatar, he could conceal his age and appearance and dramatically increase the chance that young girls would choose to add him as a "friend."

376.    Rhoades further understood that once he was accepted as a friend, his appearance as a Bitmoji avatar allowed him to more easily groom young girls, build their trust, and convince them to meet him in real life where he could then sexually assault them.

377.    Snap did not just pass information between Rhoades and N.S. Instead, Snap's design features provided Rhoades substantial assistance in his assaults and batteries of N.S. and E.R. by referring him—an unknown adult man—to female users Snap knew or should have known were 13 or under. Snap then concealed Rhoades's real appearance from N.S., and presented him to N.S., and eventually E.R., as young, fun, and as someone they could trust.

378.    Snap knew its product was causing sexual harm and violence to its young users, and that the harm could only happen because Snapchat product features made it possible.

379.    Snap chose to continue to let this harm happen because additional users increase its advertising revenue and because it could keep its administrative costs low if it made no effort to prevent its product features from giving its predatory users the means they needed to abuse children.

380.    Snap knew that it gave its predatory users the means necessary to commit sexual violence against its child users and knew that its profit-driven inaction effectively ensured that such violence could and would continue.

381.    By choosing to allow the conduct to continue, Snap consciously, voluntarily, and culpably supported Rhoades' sexual assault and violence against E.R. and N.S.

382.    Snap's actions were those of its governing officers or agents lawfully exercising their authority or were ratified by its governing officers. Snap at all times acted with bad motive and malice and with the hope of increasing user numbers and profit at the expense of the health, safety, and welfare of its child users.

### COUNT VIII — ASSAULT AND BATTERY; CHILD SEXUAL ABUSE

383.    Plaintiffs incorporate all prior paragraphs.

384.    In late October 2020, when E.R. and N.S. were still only 12 years old, Snap directed N.S. to Defendant Brandon Rhoades.

385.    N.S. and E.R. did not know Rhoades in real life and Snap made him appear to be young and harmless and told N.S. and E.R. that he was harmless.

386.    After Snap identified and connected the minor plaintiffs to Rhoades, he convinced them to meet up with him at a local school.  Rhoades gained access to them through and because of Snap's product features, which Snap knowingly and deliberately made available to minor users to increase Snap's own revenue.

387.    After N.S. and E.R. met up with Defendant Rhoades, he sexually abused them, raped E.R., and then left them for dead in the early hours of November 2, 2020, in the snow, after driving off with their shoes and jackets in his car.

388.    As a result of Rhoades's sexual assault, battery, and other abuses of E.R. and N.S., the minor plaintiffs suffered and continue to suffer severe mental harm, emotional distress, physical harm, and pecuniary hardship.

## COUNT IX — LOSS OF CONSORTIUM

389.    Plaintiffs incorporate all prior paragraphs.

390.    A.L.is E.R.'s mother; N.D. is N.S.'s mother.

391.    A.L. and N.D.'s claims are derivative of E.R.'s and N.S.'s claims and may not be brought separately. Thus they are tolled pursuant to the minor plaintiffs' minority. *See* 12 V.S.A. § 551.

392.    N.D has experienced a loss of companionship and emotional distress due to the impact of N.S.'s struggles following the November 2020 assault. Before the assault, N.D. and N.S. shared a close bond, which has deteriorated since the attack. N.S. lives primarily with N.D., who has had to reduce her work hours to support N.S., and the family's harmony has been disrupted. The once-vibrant family life filled with shared interests has been replaced by stress and anxiety. N.D.'s ability to provide emotional support has been

compromised, resulting in a loss of companionship that affects both their quality of life and family unity.

393.    A.L. has experienced loss of companionship and emotional distress due to the impact of E.R.'s mental health struggles following the November 2020 rape. Before the rape, A.L. and E.R. shared a close bond, pursuing activities together, like gymnastics and Mandarin lessons, and discussing E.R.'s hopes of becoming a plastic surgeon. However, since E.R. began using Snapchat and was raped, E.R. has faced mental health challenges, including anxiety, depression, and an eating disorder, and their relationship has deteriorated. E.R. withdrew emotionally, leading to a strained dynamic between them for a substantial time.

394.    E.R. lives primarily with A.L., who had to reduce her work hours to support E.R., and the family's harmony has been disrupted. A.L. needed to shift her focus from her successful career in tech sales to managing E.R.'s medical appointments and mental health needs, which has taken a toll on their mother-daughter emotional connection. The once-vibrant family life filled with shared interests has been replaced by stress and anxiety. A.L.'s ability to provide emotional support has been compromised, resulting in a loss of companionship that affects both their quality of life and family unity.

395.    As a result of the wrongful and negligent acts of the defendants, and each of them, the plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of financial support, loss of society, loss of affection, and loss of assistance, all to the detriment of their parent–child relationship.

396.    All these injuries and damages were caused solely and proximately by the negligence of the defendants.

## PLAINTIFFS DEMAND TRIAL BY JURY

WHEREFORE, plaintiffs seek the following relief:

    a.  Compensatory economic and noneconomic damages;
    b.  Punitive damages;
    c.  Exemplary damages under Vermont's Consumer Protection Act;
    d.  Prejudgment interest;
    e.  Attorney's fees and costs under Vermont's Consumer Protection Act; and
    f.  All other relief the Court deems just and equitable

DATED at Barre, Vermont this 14th day of March 2025.

Respectfully submitted,

A.L., *individually and on behalf of minor* E.R. &
N.D., *individually and on behalf of minor* N.S.,

By: _____

Stefan Ricci, 4776
stefan@mdrvt.com
Andrew B. Delaney, 4754
andrew@mdrvt.com
MARTIN DELANEY & RICCI LAW GROUP
100 North Main Street
PO Box 607
Barre, VT 05641
Phone: (802) 479-0568
Fax: (802) 479-5414

Matthew P. Bergman (*pro hac vice to be filed*)
Matt@socialmediavictims.org
Laura Marquez-Garrett (*pro hac vice to be filed*)
Laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Ave, Ste 102 - PMB 2383
Seattle, WA 98104
Phone:  (206) 741-4862
Fax:     (206) 957-9549